[No. S016569. Jan. 23, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK ALAN BRADFORD, Defendant and Appellant.

1010

1014

**COUNSEL**

Jonathan P. Milberg, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungern, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Susan Lee Frierson and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—A jury found defendant Mark Alan Bradford guilty of the first degree murder of Lynea Kokes (Pen. Code, §§ 187, subd. (a), 189),[1] first degree robbery (§ 211), rape (§ 261, former subd. (2)), and sodomy (§ 286, subd. (c)). The jury also found that defendant had personally used a knife in the murder and robbery (§ 12022, subd. (b)), and found true the special circumstance allegation that defendant intentionally killed Kokes for the purpose of preventing her testimony in a criminal proceeding (§ 190.2, subd. (a)(10)). The jury found defendant not guilty of burglary, and found not true the rape-murder, sodomy-murder, and burglary-murder special-circumstance allegations. (§§ 459, 190.2, subd. (a)(17).) Defendant was sentenced to death.

The case is before us on automatic appeal. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) For the reasons that follow, we reverse the conviction and sentence for robbery; in all other respects, the judgment is affirmed.

### I. FACTS

#### A. *Guilt Phase*

On April 18, 1988, Lynea Kokes (Kokes), her husband Alexander Kokes (Alexander), and their baby boy Jonathan were moving to apartment 238 of the Panorama City Lodge (Lodge). Kokes was taking over as the Lodge manager. The last time Alexander saw his wife alive, Kokes was dressing their son and preparing his breakfast to take with him to the babysitter. Kokes and Alexander agreed to meet at 6 p.m. at their old apartment, pick up their son from the babysitter, and load up their remaining belongings.

In March of 1988, defendant and Randall Clay Beerman moved into apartment 252 of the Lodge. On April 18, starting about 10 or 11 a.m., defendant and Beerman played cards and drank Black Velvet and beer.

At approximately 11 a.m., Joseph Christopher Stevens, the assistant manager of the Lodge, arrived at the Lodge to begin his last day of work. His

---

[1]All statutory references contained herein are to the California Penal Code unless otherwise indicated.

cousin Jack and Kokes were already in the office. A number of times that afternoon defendant came into the Lodge office "leering" at Kokes.

At approximately 2 p.m., defendant told Beerman he was helping the new manager move into her apartment. Defendant described the manager as attractive, and bet Beerman money that "he'd get her in bed that day while her husband was gone." Defendant was coherent, did not slur his words, and was able to walk and take care of himself.

Between 3:30 and 3:45 p.m., Stevens and Jack observed Kokes and two Lodge employees inside the Lodge office. The office had been broken into. A glass panel was broken, and certain metal was bent. After speaking to one of the Lodge employees, Stevens and Jack went to the pool and spoke to defendant. The three returned to the office, and Stevens told defendant to vacate his apartment because the rent was overdue and because he had been identified as breaking into the office. Defendant muttered that he was sorry, and said, "It wasn't me who did it." Defendant looked at Kokes with a salacious grin and said, "You are the new manager. I want you to take care of me." Defendant and Stevens argued, and defendant threatened to come behind the counter. Defendant left the office when Stevens falsely told him he had called the police.

At approximately 4:30 p.m., the movers arrived at the Lodge, and Kokes left to meet with them. Also about this time, Philip Hall, a swimming pool contractor, arrived at apartment 238 to meet with Kokes. Defendant was inside, with one or two other men, holding a cardboard box in his hands. Defendant had no trouble walking and did not appear to be under the influence of anything. Defendant apparently left the apartment. Hall and Kokes talked outside regarding the pool and spa until approximately 5 p.m.

According to defendant's statement to Detective Arnold, which was introduced at trial, defendant returned to apartment 238 after his encounter with Stevens. "Then I left the office and went up and talked to that girl to see what . . . she could do about us working out a monthly rent, since she was taking over the next day. . . . She said she probably could. She'd see what she could do tomorrow." Defendant then "grabbed her throat" with his right hand, and as she began to fall down, removed her clothes with his left hand. As Kokes gasped for air, defendant raped and sodomized her. He repeatedly hit her until she lost consciousness. Defendant put his penis in the victim's vagina, then in her rectum, and then back in her vagina until he ejaculated. Kokes was choking on her blood, gasping for air, and bleeding from her nose.

Defendant returned to his apartment for approximately 45 minutes, and showered to wash the blood off his hands and arms. He was thinking, "If she

was gonn[a] live, you know, and ratting me off." He wanted to make sure she was dead, and returned to her apartment with a knife.

Kokes was still gasping for air. Her eyes were closed, and her arms were not moving. She was bleeding slightly out of her nose. He rolled her over, put a belt around her neck, put his right knee in her back, pulled her head up by her hair, and slit her throat twice. Then he rolled her back over "and stabbed her a bunch of times, I don't know how many . . . in the chest area." "I figured she ought to be dead after all that." He took her wallet and makeup bag, stuck the now broken pieces of the knife in his back pocket, and returned to his apartment. He was in the apartment the second time fewer than 15 minutes. He changed his clothes, washed his hands, and packed.

At 5:05 p.m., Stevens called 911 and told the police he was having trouble with a tenant. The police responded, "We'll be there." The police apparently did not respond to this call.

While awaiting the officer's arrival, Stevens went to apartment 240 to give a tenant a receipt. After doing so, Stevens observed defendant leaving his apartment. Defendant's hair was wet and he appeared as if he had just left the shower. Defendant wore only a pair of jeans and carried a towel. Stevens told defendant he had called the police and that he "better get out of here." Defendant followed Stevens, and Stevens repeated that he had called the police and that defendant had better leave. Defendant said, "I really got to get the hell out of here," turned around, and ran back to his apartment.

At approximately 6 p.m., Beerman was awakened in apartment 252 by the sound of defendant in the bathroom. Defendant was wet, had a towel around him, and was changing his clothes. He had packed his clothes and other belongings in two bags. Defendant was nervous, "pacing around the room, and in and out of the room constantly. Just couldn't sit still." His knuckles were scraped and bloody. Defendant told Beerman he had gone to the office to talk to "Joe," but that Joe was not there. The alarm went off when he went into the office, and the maid had seen defendant and accused him of trying to break in. The manager had confronted defendant, and he and Beerman had 30 minutes to pack and leave or they were going to call the police. Defendant asked Beerman to give him a ride to Fresno.

Defendant had vomited in the bathroom and used some towels to clean it up. Beerman told defendant to wash the towels in the laundry room. While defendant was in the laundry room, Beerman observed a knife handle lying on the bathroom floor. Beerman was a chef, and the handle was from one of his knives.

Defendant appeared nervous when he returned from the laundry room. Defendant said that he had an outstanding warrant for his arrest in Arkansas, and that he wanted to leave so as not to have to deal with the police.

Beerman called his friend Dan to see if he would assist Beerman in packing his belongings, but was unable to reach him. The apartment telephone then stopped working, and the office was closed. Beerman made several trips by car to a nearby supermarket to use the pay phone there. Defendant accompanied Beerman on some of these trips, and appeared nervous and upset, but otherwise "perfectly normal." At some point after 5 p.m., defendant called Pamela DeLong, an ex-girlfriend who lived near Fresno. Defendant did not sound to her as if he had been drinking. DeLong told defendant he could stay with her.

As it began to get dark, Beerman and defendant went to McDonald's for dinner. According to Beerman, during the several hours between the trip to McDonald's and defendant's subsequent arrest, defendant was nervous and upset, and repeatedly asked Beerman to give him a ride to Fresno. Defendant also seemed coherent, able to take care of himself, walked normally, and talked "okay."

After dinner, Beerman went to the laundry room and moved the towels from the washer to the dryer. As he did so, he heard a metallic sound on the washing machine and saw a bent knife blade. This was the blade of the knife handle Beerman had earlier seen on the bathroom floor. Beerman placed the knife on the side of the washing machine.

At approximately 5:50 p.m., Alexander Kokes arrived at the couple's old apartment. No one was present. Between 6 and 7 p.m. he retrieved their son from the babysitter and loaded the rest of the family's belongings into the truck while awaiting Kokes's arrival. Shortly after 7 p.m., he arrived at the Lodge. The office was closed. All of the doors of apartment 238 were locked, and Alexander did not have a key. It did not appear to Alexander that his wife was in the apartment. Alexander returned to the lobby and waited for the managers to arrive.

Between 8:15 and 8:30 p.m., Stevens and Jack returned to the Lodge. Alexander was in front of the Lodge holding his baby. Stevens gave Alexander a key to apartment 238.

Alexander and his son went to the apartment. Upon entering, Alexander observed Kokes lying on the floor with her throat cut. Her body was nude, except for two knee-high stockings and a pair of pants wrapped around her

ankle. He turned and ran downstairs, told the managers to call for an ambulance and the police, gave them his son to hold, and ran back to the apartment. Alexander checked Kokes for a pulse, and covered her with a crib sheet. He left the room when he heard sirens, and directed paramedics to his wife. Kokes was pronounced dead at 8:49 p.m.

Around 8:30 p.m., Beerman went downstairs to use the telephone and observed the arrival of the police and paramedics. Defendant, Beerman, and many of their neighbors stood in the hallway near apartment 238 for about 15 minutes. Beerman said, "I wonder what happened down there." Defendant said, "Some gal got killed down there." Once inside their apartment, defendant told Beerman that "the new manager chick . . . got beat up, raped, and her throat slashed open." Defendant paced back and forth, and told Beerman he did not want to talk with police because of his outstanding Arkansas felony warrant. When police knocked on the door, he told Beerman, "I don't want to answer it." Beerman answered the door, told police he had not heard anything earlier, and the officer departed.

At approximately 10 p.m., Beerman spoke on the telephone with his father. Thereafter, he contacted a security guard, who brought Beerman to Detective Coblentz. Beerman led Detectives Riehl and Coblentz to the laundry room and showed them the knife blade. He then let these and other officers into his apartment, where they arrested defendant. Officer Bergstrom searched defendantt about 11 p.m. He recovered a wooden knife handle with dried red liquid on it from defendant's rear pocket. He then drove defendant to the police station. During the ride, defendant appeared coherent and to understand everything the officer said. Defendant was very cooperative and "talked very friendly." His eyes were clear, and he did not appear to be under the influence of anything.

Detectives Riehl and Warren recovered a brown suitcase and green duffel bag from defendant's room. Inside the suitcase was Kokes's wallet, makeup kit, cosmetic bag, checkbook, driver's license and other identification, and credit cards. Inside the duffel bag was a blue, long-sleeved shirt with red stains splattered and smudged on the front, and a pair of blue jeans with a large amount of red stain.

The forensic evidence indicated that Kokes was raped, sodomized, and her nipples "savage[ly]" bitten off. The police were unable to locate the skin from the nipples. Her right eye was blackened, and her nasal bone broken in several places. Part of her larynx was fractured. Hemorrhages on the right and left side of her neck were the result of force to the larynx and neck area. A ligature was tied around her neck so tightly it cut off air, and her throat

was slashed twice. There were also seven penetrating stab wounds. Five of these wounds went through her rib bones, fracturing them, and four penetrated her heart. There were also smaller nicks and nonpenetrating wounds. All of these injuries occurred while she was alive. The cause of death was a combination of the strangulation and the stab wounds; the two throat slashings did not contribute to Kokes's death. There were no defensive wounds.

There was sperm in Kokes's vaginal, anal, external genital areas, and mouth. The criminalist could not say that the semen was from defendant, but he could not be excluded either. Amylase, a substance found in human saliva, was detected on both breasts, and plaster casts of defendant's front teeth fit "pretty solidly" into casts of the remaining portions of Kokes's breasts. Defendant's fingerprint was found on the crib. Stains on the knife and defendant's shoes, pants, and shirt tested positive for the presence of blood consistent with Kokes's.

Defendant rested without introducing any evidence.

B. *Penalty Phase*

1. *Prosecution Evidence*

The prosecution relied on the guilt phase evidence for its penalty phase case-in-chief and offered no further evidence.

2. *Defense Evidence*

James Edwin Hamer and his wife Glenda Gail Hamer were friends with defendant's parents when he was a child. James testified that defendant was shy, caring, and polite as a child. Defendant's mother appeared loving and caring, and defendant appeared respectful and caring of her. Both James and Glenda testified that in their view defendant's parents disciplined him too harshly and verbally abused him. They never physically punished defendant.

Pamela DeLong, the former girlfriend defendant contacted the night Kokes was murdered, testified regarding defendant's care of and attention to her during their several-month relationship. She also testified regarding one incident when defendant was drunk and physically abusive.

Kent Power, Jr., a teacher at Wayside County jail, testified that defendant had performed well as both his assistant and as a student.

Alfred Cohen, an investigator for the Los Angeles County Public Defender's office, testified that he spoke with Beerman several months after the

murder. Beerman said that between 10 a.m. and 4 p.m. on the day of the murder, defendant consumed approximately a quart and a half of Black Velvet and a six-pack of beer, and was "definitely drunk."

Dr. George Thompson, a psychiatrist and neurologist, testified that on May 17, 1989, he caused an electroencephalogram (EEG) to be conducted on defendant. During this exam, alcohol was administered to defendant. Thompson was able to diagnose from the EEG alone that defendant suffered from what he termed "acute pathological alcoholic intoxication" (APAI), which he characterized as essentially a form of psychomotor epilepsy. According to Thompson, a person with this condition who ingests even small amounts of alcohol cannot thereafter control his or her conduct, may act violently, and will suffer partial or full amnesia regarding the outburst. The APAI patient usually has a history of brain trauma; defendant suffered a severe head injury when he fell from a truck at age 14. Thompson's diagnosis was further bolstered by his interview with defendant in which defendant was able to recall some but not all of the details of Kokes's murder, and by defense counsel's statement that defendant had been drinking the night of the murder.

Thompson was unaware of and was not provided with defendant's detailed statement describing the murder. Defendant's demeanor did not change, i.e., he remained calm and cooperative after he was administered alcohol during the EEG.

### 3. *Rebuttal Evidence*

Dr. Ronald Markman, a psychiatrist and neurologist, reviewed the transcript of Dr. Thompson's testimony, a tape recording of defendant's statement, defendant's medical records and EEG exam results, his military records, and the arrest, police, and autopsy reports. Markham opined that defendant did not have "idiosyncratic intoxication," a more modern name for APAI. Markham stated that it was not possible to diagnose APAI merely from an EEG, but that the patient's history also had to be examined. Because the condition is induced after ingestion of only small amounts of alcohol, "[i]f someone can consume a lot of alcohol and continue to consume it, you've really excluded that diagnosis." In addition, Markham noted that partial or full amnesia was "one of the major phenomen[a]" associated with APAI. In his view, defendant's detailed statement to police "negate[d] the suggestion that there was any amnesia." Rather, "there was clear evidence that [defendant] knew what was going on when he acted" on the night of the murder.

Thomas Craig Ward, defendant's first cousin, testified that he played and vacationed with defendant and his family during the first 12 years of his life,

and maintained a close relationship with defendant until he was 18 or 19 years old. Ward observed that defendant's parents treated him normally and did not ridicule defendant or punish him excessively. Defendant never told Ward his parents were unfair or mean.

## II. DISCUSSION

### A. *Guilt Phase*

#### 1. *Admission of Defendant's Postarrest Statements*

Prior to trial, defendant moved to suppress four postarrest statements.[2] After a hearing, the trial court granted defendant's motion in part. It ruled: 1) defendant's first statement to Detective Riehl was obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and could not be used in the People's case-in-chief, but because the statement was voluntary, it could be used for impeachment; 2) defendant's booking statement to Officers Denby and Gordon was voluntary and not the product of interrogation, and could be used at trial for all purposes; 3) defendant's third statement to Detective Hooks was the product of improper police tactics and could not be used at trial for any purpose; and 4) defendant's fourth statement to Detective Arnold was initiated by defendant, voluntary, and not in violation of *Miranda*, and was admissible for all purposes. At trial, neither defendant's first statement, made to Detective Riehl, nor his third statement, made to Detective Hooks, was presented to the jury. His second statement, made during the booking process to Station Officers Gordon and Denby, and his fourth statement, made to Detective Arnold, were presented.

Defendant contends that the trial court committed reversible error in admitting his second and fourth statement. He contends his second statement was obtained in violation of *Miranda* v. *Arizona*, *supra*, 384 U.S. 436, and tainted by a prior illegal interrogation. His fourth statement, he contends, was the tainted product of earlier illegal interrogations, the result of psychological coercion, and obtained by police lies regarding when he would see an attorney. We agree with his contentions in part as to the booking statement, but conclude that the trial court's error in admitting those portions of the statement was harmless. We further conclude that the remainder of the booking statement and the fourth statement were properly admitted.

---

[2]The hearing was before Judge Coleman; Judge Farrell was the trial judge. The parties stipulated that the pretrial ruling of Judge Coleman would be binding on the trial court.

### a. *Factual Background*

### 1) *Defendant's Statement to Detective Riehl*

On April 19, 1988, at 5:05 a.m., defendant was interviewed on tape by Detective Riehl at the Van Nuys police station. A transcript was made of this interview. Detectives Arnold and Coblentz were also present. After obtaining certain background information about defendant, Detective Riehl informed defendant of his *Miranda* rights. Detective Riehl then asked, "Do you wish to give up the right to remain silent? Do you want to talk to me about what happened last night?" Defendant said, "No. I want my lawyer." Detective Riehl asked defendant again if he wanted to give up the right to speak to an attorney and have him present during questioning. Defendant reiterated that he wanted an attorney, and said, "I want [to] talk to him first, I think."

Detective Riehl responded, "Okay. Let me explain something to you first. Now let me just, off the record, between the three of us. You're looking at a few years of experience here, okay? And we know pretty much what happened because that's our job. We also know that having handled a number of cases that what occurs at a later date and like I say, this is just off the record, just between the three of us, because we're just detectives, we're curious about things that we see physically, we're just kind of curious how it happened. Sometimes, I know that when you get yourself in a situation like this, it really looks bleak. You say to yourself, 'Man, this is bad.' But I find and my partners here have found that sometimes there is mitigation. There's a reason why things happen. You see what I'm saying and for whatever reason, it just happens. It's what you call like a 'heat of passion.' And a lot of times with males and females, that's what happens. You get into a little situation. You know you try to get next to one another and things don't work out, that's all. And one person gets pissed off and you know through no fault of anybody's once in awhile, they have a couple of drinks, you know, and their minds just not working like it normally does. We understand that. But those are things we have to know, those are things in all honesty are in your defense. You see what I'm saying? Otherwise, you're just stuck. It's like looking at one side of the coin and saying, 'But there's two sides of the coin.' And that's, I know you've never found yourself in any kind of trouble before like this, and you're saying to yourself, 'Okay, this is, this is . . . .'" Defendant said, "Yeah." Riehl continued, "This is, yeah, this is something that I didn't know about, but what I'm trying to tell you is that sometimes you just have to, you know, it's easier to talk about it. You understand what I'm saying? I can say it's off the record, I just want to, just from an investigative standpoint, we're just curious how you even got

involved with her?" Defendant then discussed his failed marriage to a different woman, substance abuse, and criminal background in Arkansas.

At the end of this discussion, Detective Riehl said, "Well basically like I told you, you already told us that you don't want to talk to us and that's fine and from a legal standpoint you're safe and I wouldn't lie to you, I really wouldn't. I have no reason to lie to you and I don't want to lie to you." Defendant said, "You see I really don't know what to do, you know, I mean . . . ." Riehl responded, "I know when you're in this position, sometimes it's easier to just go ahead and say, 'Hey, this is what happened.' I don't know, man, I had a couple of drinks today . . . ." Defendant said, "I admit I was drunk." Riehl said, "And I went crazy, you know, and I saw this . . . ." Defendant said, "You know what really started it off?" Defendant then relayed the incident with Stevens when defendant was accused of breaking into the Lodge office.

Detective Arnold then said, "So what did you do?" Defendant answered, "I messed up, I know that." Arnold said, "Tell me what you did." Defendant asked, "Is this off the record?" Riehl said, "This is, like I told you, it's off the record." Defendant said, "I did what you said you'd catch me at." Arnold said, "What?" Defendant said, "What you been sayin all night." Arnold asked, "What, kill that girl?" Defendant said, "Yes, sir." Arnold then asked, "How'd it happen Mark?" Defendant described helping Kokes move, and asking her to work out a rent payment schedule. Riehl said, "You know you'll feel a whole lot better Mark when you get it off your chest, talk to us about it. You know we told you it's off the record, but this is an opportunity for you to get it off your mind and feel better about it later." Defendant said, "I'm more worried about going to jail than that being on my mind." Riehl said, "You still have to get it off your mind, that's gonna be there a long time. So talk to us about it." Defendant then explained how he crushed Kokes's throat with his hand, raped, sodomized, and beat her. He then went home for an hour and showered. When he returned, she was gasping for breath and bleeding. He strangled her, slit her throat, and stabbed her.

### 2) *Defendant's Booking Statement*

Defendant's booking statement was introduced at the pretrial hearing through the testimony of Station Officer Gordon. She also testified at trial regarding this statement. Officer Gordon's name at the time defendant made the statement was Officer Morgan.

On April 19, 1988, at approximately 7 a.m., Station Officer Gordon booked defendant for murder. Following the booking procedure, Gordon's

partner, Station Officer Denby, then fingerprinted defendant. While she was doing so, Officer Gordon fingerprinted an unidentified detective applying for a license to be a private investigator. This detective told defendant in a casual tone defendant looked "like a traffic ticket" and asked, "Is it just a warrant?" Defendant responded, "Murder." Officer Gordon had completed fingerprinting the detective, and after defendant's response the detective immediately left to wash his hands in another room. Approximately two minutes passed during which neither Officer Gordon nor Officer Denby spoke to defendant. While Officer Denby completed fingerprinting defendant, defendant then told the officers he had helped Kokes move into her apartment. He returned later and knocked on the door and she let him in. He choked Kokes, and as she was gasping for air he put his hand over her mouth and raped her. He left the apartment to clean up. Upon realizing that she would not die from him just strangling her, he returned to Kokes's apartment to kill her. *To this point, neither officer had asked defendant anything.*

Officer Gordon then asked defendant if he felt sorry for what he had done. Defendant replied, "No." He told the officers that he slit Kokes's throat, and she died. He then stabbed her in the chest. One of the officers asked, "Well, if she died after you slit her throat, why did you stab her?" Defendant replied, "I just wanted to be sure." Defendant said that the officers had told him that he had cut the woman's breast off and he didn't remember that but if they said so he guessed he had done it. At some point Officer Denby asked defendant, "Didn't the woman have a child?" He replied, "Yes," and that he was sorry. Defendant seemed "very calm." His only concern was that the officers not call his parents. At no time during the conversation did the officers advise defendant of his *Miranda* rights. Both officers were in uniform and wore badges. They subsequently relayed the events to their sergeant, who instructed them to make written reports.

### 3) *Defendant's Statement to Detective Hooks*

On April 19, 1988, Detective Hooks sought and received permission from Detective Arnold to interview defendant. Hooks was aware that defendant had asked to speak to an attorney. He wanted to speak with defendant because of the "unique circumstances of this case," meaning "the violent nature, the sexual overtones. I thought it would be good experience to go down and actually talk to someone like this."

At 9:30 a.m., Hooks interviewed defendant. The interview was taped and transcribed. He did not advise defendant of his *Miranda* rights. Rather, he told defendant that "it's my understanding that you chose not to waive your rights at this time, is that correct?" Defendant responded, "What does that

mean?" Hooks said, "Well, the officers gave you your rights, your Constitutional Rights, it means you don't have to talk to us without an attorney present and all that stuff, you understand that, right? You said you wanted an attorney, right? Okay." Defendant said, "Just to help me out a little bit cuz I got screwed over in Arkansas over this . . . ." Hooks apparently interrupted by saying, "Is that where you're from Mark?" The two then discussed defendant's Arkansas criminal experience, and his concern that those he had informed on would locate him.

Hooks then said, "[L]et me explain to you just so I know that you understand what went on with the rights, okay? What you're basically saying is once we give you rights and you say, 'God, I'd rather not talk to you without an attorney.' What that basically means is that we can't get your side of the story about what happened, if you'd been drinking too much or had too much coke or whatever, to create this kind of activity, I just want you to understand that, okay? This is your chance to give us your side of the story, if you don't want to do that, that's fine, that's up to you. I'm gonna talk [to] you anyway about it, just for my own personal knowledge and for information, maybe down the line, we can help someone who maybe has the same problem that you do. I just want you to understand that, if you do decide down the road here and when I say down the road no later than Thursday because that's when the arraignment is going to be, that you do want to talk quote, 'on the record', okay?" Defendant said, "Yeah."

Hooks then said, "I'm going to leave you a card, if you decide you want to, . . . because some people in a situation like that do get the feeling that, hey, I want to clear it up, I want to get it done, I want to take care of business now, get it finished, cleanse my soul, so to speak, and move on with my life. . . . if you want to do that, you can call me or Detective Riehl, okay? And what you have to do is get a jail[e]r and say, 'I want to talk to this detective.' Give him a card, he'll call us and we'll come back down, then we can go through the rights again and talk on the record. I just want you to understand that?" Defendant responded, "So, this one is off the record?" Hooks said, "This is off the record." Defendant said, "Okay." Hooks said, "Basically, where are you from?" The two proceeded to discuss defendant's life in Arkansas, his work as a chef, his move to California, and his drug and alcohol usage.

Hooks then said, "So like I say, I know you've been through this once already and I appreciate you taking time to go over it with me again. Like I say, it's for my information, it's at your request now that this isn't used in court or anything else. That's fine, I respect that, but by giving me this information, by going over it and being honest and candid with me, maybe

down the line we can prevent something like this and help somebody." Defendant said, "Yeah." Hooks said, "That's why I'm here, to go through this thing with you again and believe it or not, it will eventually down the road probably make you feel a little better too." Defendant said, "Yeah." Defendant then, in response to Detective Hooks's questions, relayed the prior day's events from the time he got up in the morning until his arrest. He described his attack on Kokes in a manner similar to that made in his statement to Detective Riehl.

Hooks said, "I appreciate you talking this way, and believe me you're gonna feel better down the road when it's done. You have to get these demons out of you, man, if you know what I'm saying. That sounds corny, but it's the truth." Defendant said, "Yeah." Defendant then described going home to shower, and returning to kill Kokes with details similar to his statement to Detective Riehl.

Hooks said, "Believe me, there have been people who have done things worse than this. A lot worse. Granted, someone is dead, you're caught up in a frenzy type thing. You had a lot to drink, there's no doubt about that and I don't think the real or the normal 'Mark' would have done this." Defendant replied, "I know I wouldn't." They continued discussing the events during and after the murder, and discussed defendant's psychological background.

Hooks then said, ". . . Well, like I say, it sounds like you fell victim to that bottle a little bit, it really does, and like I said, if you want this to go on the record to get your side of the story in, I'll give you my card and call me or Riehl. . . . I'm not going to make any promises or anything else, I wouldn't do that. I'm going to be up front with you about what happens and about what is going to happen in that I don't know what's going to happen at this point." Defendant inquired, "What can happen?" Hooks said, "Well, it can go anywhere from, and this is just my opinion, I'm not telling you what's going to happen, it can go anywhere from a 2nd degree murder to a 1st degree murder, which basically, a 1st degree murder is more severe, as you can imagin[e]. It's hard to tell, it really is with these things. Once we get into court, the lawyers are judges, everything is going to be considered. Specifically, your drinking, how much you had, if you'd done this kind of thing before. If there's a trail o[f] girls laying from here to Colorado, then it doesn't look too good for you. And I'll tell you this right now, we are going to find out. We've already sent teletypes out across the United States, just as a precautionary thing, it would be better if we could clear it up now and start toward, maybe if you had this problem somewhere else, and if you can zero us in on it a little bit." Defendant responded, apparently intending to deny the existence of other murders.

Hooks said, "Okay, that's great, that's fine and like I say, it['s] completely up to you if you decide you want to talk and we'll get in on the record, your feelings about what happened and how you feel about it and everything else . . . it's up to you. . . ." Defendant said, "Okay." "And I really appreciate you talking to me Mark. I really do. I hope things work out for you, I'm sure they will. The main thing now whatever happens with this is that you have to get off that bottle and that coke. That's what's killing you." "Yeah." "You're not a stupid guy, you're fairly intelligent, you know how to make money, you have a problem with that bottle, man. And I think that's at the root of this whole mess. Do you agree?" "Yes." Hooks said, "Okay."

Defendant then asked, "Like I talked to one detective who was saying maybe we can't see what we can't do." Hooks replied, "Sure, down the road and like I say he's not making you any promises of leniency or anything else. You're gonna have to pay for what you did, there's no doubt about that, you understand that, you've had a wife and girlfriends and a family so, we'll see what happens. Like I say, if you want to talk [s]ome more, you give me a call, okay?" Defendant said, "[I] appreciate this, so if I don't want to put it on the record unless I got a lawyer, I won't see one til Thursday, right?" Hooks said, "Right. Okay? Thanks Mark, I appreciate it. . . ."

4) *Defendant's Statement to Detective Arnold*

The next morning, April 20, 1988, defendant called Detective Hooks and said he wanted to put a statement on the record. At approximately 10 a.m., defendant met with Detective Arnold. The interview was tape-recorded and transcribed.

Arnold asked, "Why did you want to talk with us?" Defendant replied, "I had some questions and I'll probably talk, I don't know." Arnold said, "Ok." Defendant asked, "Ok, everything I've said so far is off the record, right?" "That's correct." "And I already know I'm going to the penitentiary, you guys talk about getting help, do I get help down there?" "What kind of help are you talking about, man?" "I don't know, that the thing . . . ." "For what's going on in your head?" "Yea. . . ." "Yea, yea." "And who decides that, if I get the help?" "Well, it's normally part of the sentence or part of the whole situation." "So I could be like sent down there to be put in like a mental institution down there[.]" "Let's put it this way, you could go any place from San Qu[e]ntin to Atascadero State Hospital, which is a hospital for people with mental problems involved in criminal activity—you could go to, ah, I think there's one in [V]acaville which is a medical type situation, ah, and I think there's a couple others, I can't remember off hand. But . . . the two [absolute] extremes in [V]acaville, not [V]acaville, but Atascadero

which is a real heavy mental facility and San Qu[e]ntin or Folsom which is the slam dunk criminal side of it. And of course the Spectrum is all the way in between that, so you know, it[']s obvious you have some sort of a problem and it, I'm sure contributed to this incident."

Defendant then asked, "Say like I don't want a lawyer, do you guys tell the judge that, you know, you think I got a problem, or do I got to get a lawyer to do that? You know what I'm saying?" Arnold replied, "Well, what you do is you tell me that you, cuz I don't know if you have a problem unless you tell me you got a problem. You tell me—Hey, look I got a problem—I got hang-ups, I got stuff like that. You know I didn't just get off the tuna boat, right?" "Uh uh." "Ok, just by seeing what happened I know you have a problem cuz I've been doing this for a long time and what happens is I tell the judge what I observed. I tell the judge what you tell me right? I put it down in my documentation and say, 'Hey, here's what we got.' Ok. The man has a problem and probably [it's] a real good thing we got you now instead of 2 or 3 down the road. Or whatever may be behind." "There's none behind, I told you already." "So, anyway, so that's the deal. If you would like to make an on the record statement, we'll do it. I'll readvise you of your constitutional rights and then we'll go ahead and I'll put your words on this piece of paper here and I'll give you the opportunity to look over it and that'll be your official version of what happened and ah, you want to t[a]lk about what's going on in your head, we'll talk about that too." "I really don't know what's going on in my head—that's the thing." "But I tell you, there's definitely something going on, like I can see it, and we'll take care of business, ok? Is that what you'd like to do?" "Yea[.]"

Arnold then said, "Ok, nobody's making any threats to you?" "No." "Making any pr[o]mises to you?" "No." "Ok, I'm going to advise you of your constitutional rights again, ok? Ok. You have the right to remain silent which means you don[']t have to talk to me. If you give up the right to remain silent, anything you say can and will be used against you in a court of law right?" "Ok." "You understand that whatever you tell me now, you're going to see it later, right?" "Yea, ok." "You have the right to speak with an attorney and have an attorney during questioning—in other words, if you want to talk to me and you want to have an attorney here, you have the right. Ok." Defendant asked, "How long does that take if I do?" "Well[.]" "Just out of curiosity[.]" "I'll be right honest with you—it would take awhile." "Yea—that one guy said I couldn't see a lawyer till after Thursday." "Who's that?" "Det[ective] Hooks." "Well, you'd see a lawyer, if you have a private attorney, you could see a private attorney just dialing up on the telephone. Public defender—you'd first see a public defender tomorrow. So[.]" "Do I still see one tomorrow anyway?" "Sure—now let me explain something to

you, when you give up your right to have an attorney, we're only talking about you and me talking here, any t[ime] down the line you say, 'Hey, Det[ective] Arnold, I want an attorney here.' Fine. We'll get you an attorney. That doesn't mean you're giving up your right to an attorney any time during the criminal process." "Ok." "You'll have your public defender when you go there, you'll have all the representation your little heart desires—compliments of the State of California. So, when I say you have the right to remain, or the right to have an attorney and if you give up the right to have an attorney that's only for you and me talking—not any place down the line." "Ok." "Any questions on that?" "No." "Ok . . . . You have the right to have an attorney present during questioning—ok—and if you cannot afford an attorney, one will be appointed for you without charge before questioning. Ok, you understand that?" "Ok." "Now, do you wish to give up your right to have an attorney present during this conversation?" "Yea." ". . . Just to be sure, I'll go over it again. You have the right to remain silent—if you give up the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to speak with an attorney and have an attorney present during questioning. If you so desire and cannot afford an attorney, one will be appointed for you without charge before questioning. Ok? Do you understand? Ok—Do you wish to give up your right to remain silent and talk to me, about this incident?" "Yes." "Yes?" "Yea, I'll talk to you." "Yes?" Defendant's response was inaudible. Arnold again asked, "Yes?" Defendant said, "Yes." "Ok—Do you wish to give up your right to have an attorney present during questioning?" "Yea."

Defendant and Arnold discussed defendant's background, his move to California, and the weeks preceding the attack. Defendant also described the events of April 18 from the time he woke up until his arrest, including the attack on and murder of Kokes. His statement regarding the murder is recounted above. (See *ante*, pp. 1018-1019.)

Arnold then said, "Tell you what, there might be somebody I'd like you to talk to, its another detective and basically he specializes in stuff like this and he'd probably like to talk to you." Defendant said, "I'd be more than glad to talk." At the conclusion of the interview, defendant signed a statement generally incorporating the substance of what he had told Detective Arnold. Defendant then said, "I did kill somebody and what I did it bothers me, but it bothers me more to know that I don't get along with my parents and stuff." Arnold said, "Ok. We'll talk this afternoon. I'm sure it will make you fe[e]l a lot better."

### b. *Analysis*

In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* v.

*Arizona, supra,* 384 U.S. 436, the scope of our review is well established. "We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." (*People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610]; *People* v. *Kelly* (1990) 51 Cal.3d 931, 947 [275 Cal.Rptr. 160, 800 P.2d 516].) We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda.* (*People* v. *Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People* v. *Markham* (1989) 49 Cal.3d 63, 65 [260 Cal.Rptr. 273, 775 P.2d 1042]; *People* v. *May* (1988) 44 Cal.3d 309, 315 [243 Cal.Rptr. 369, 748 P.2d 307].)

In *Miranda* v. *Arizona,* the United States Supreme Court "determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." (*Edwards* v. *Arizona* (1981) 451 U.S. 477, 481-482 [68 L.Ed.2d 378, 384-385, 101 S.Ct. 1880].) There is no dispute in this case that defendant was in custody when he made his four statements.

The "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*" (*Oregon* v. *Elstad* (1985) 470 U.S. 298, 307 [84 L.Ed.2d 222, 230-231, 105 S.Ct. 1285].) However, if an un-*Mirandized* statement is voluntary, any subsequent statement made pursuant to a voluntary and informed waiver is admissible in the prosecution's case-in-chief. (*Oregon* v. *Elstad, supra,* 470 U.S. at pp. 303, 309, 318 [84 L.Ed.2d at pp. 228, 232, 237-238].) As the high court has observed, the "absence of any coercion or improper tactics undercuts the twin rationales— trustworthiness and deterrence—for a broader rule. Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." (*Id.* at p. 308 [84 L.Ed.2d at p. 232].) The state must demonstrate the voluntariness of a confession by a preponderance of the evidence. (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 168 [93 L.Ed.2d 473, 485, 107 S.Ct. 515]; *Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627-628, 92 S.Ct. 619].)

If the defendant receives *Miranda* warnings, and thereafter requests counsel, " 'the interrogation must cease until an attorney is present.' " (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 482 [68 L.Ed.2d at p. 384], quoting

Miranda v. Arizona, supra, 384 U.S. at p. 474 [16 L.Ed.2d at pp. 723-724].)
Interrogation consists of words or actions on the part of the police that they
should know are "reasonably likely to elicit an incriminating response."
(Rhode Island v. Innis (1980) 446 U.S. 291, 303 [64 L.Ed.2d 297, 309, 100
S.Ct. 1682].) However, if the defendant thereafter initiates a statement to
police, "nothing in the Fifth and Fourteenth Amendments . . . prohibit[s]
the police from merely listening to his voluntary, volunteered statements and
using them against him at the trial." (Edwards v. Arizona, supra, 451 U.S. at
p. 485 [68 L.Ed.2d at p. 387].) Moreover, if the defendant's statement is not
only voluntary, but constitutes a knowing and intelligent waiver of his right
to see counsel, the interrogation may resume. (Id. at pp. 482, 486, fn. 9 [68
L.Ed.2d at pp. 384-385, 387].) Such a knowing and intelligent waiver is "a
matter which depends in each case 'upon the particular facts and circum-
stances surrounding that case, including the background, experience, and
conduct of the accused.' " (Id. at p. 482 [68 L.Ed.2d at p. 385].) The state
must demonstrate the validity of the defendant's waiver by a preponderance
of the evidence. (Colorado v. Connelly, supra, 479 U.S. at p. 168 [93
L.Ed.2d at p. 485]; People v. Clark (1993) 5 Cal.4th 950, 987, fn. 12 [22
Cal.Rptr.2d 689, 857 P.2d 1099].)

1) *Booking Statement*

 Defendant first contends that his booking statement was obtained in
violation of Miranda. We agree with this contention in part.

As noted earlier, during the booking process, an unidentified detective
told defendant in a casual tone that defendant looked "like a traffic ticket"
and asked, "Is it just a warrant?" Defendant responded, "Murder." The
detective left the room, and approximately two minutes later, defendant
began describing Kokes's murder to Station Officers Gordon and Denby.
From the time the detective left the room, until defendant finished his initial
statement regarding the murder, the station officers made no remarks to
defendant.

The trial court found that defendant's statement to the officers was
voluntary and not the product of interrogation. "We review the trial
court's finding regarding whether interrogation occurred for substantial
evidence or clear error." (People v. Clark, supra, 5 Cal.4th at p. 985; People
v. Clair (1992) 2 Cal.4th 629, 678 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

 We agree with the trial court there is substantial evidence that the
unnamed detective's casual statement that defendant looked "like a traffic
ticket" and question, "Is it just a warrant?" was not an interrogation.

In so doing, we focus "primarily upon the perceptions of the suspect, rather than the intent of the police." (*Rhode Island* v. *Innis*, *supra*, 446 U.S. at p. 301 [64 L.Ed.2d at p. 308].) As the court noted, "the officer . . . made a remark, and he didn't even wait around to hear what the answer was, really after the word murder . . . ." "The case thus boils down to whether, in the context of a brief conversation, the officer[] should have known that [defendant] would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officer[] should have known that it was reasonably likely that [defendant] would so respond." (*Rhode Island* v. *Innis*, *supra*, 446 U.S. at p. 303 [64 L.Ed.2d at p. 309].) Neither the detective's statement nor his question was "reasonably likely to [elicit] an incriminating response." (*Id.* at p. 301 [64 L.Ed.2d at p. 308].)

Moreover, after independent review, we conclude that two minutes later, after the detective had left the room, defendant voluntarily initiated a discussion regarding the murder, and spoke at length before the station officers began to question him. All of these statements were therefore admissible. (*Edwards* v. *Arizona*, *supra*, 451 U.S. at p. 485 [68 L.Ed.2d at pp. 386-387].)

Following this discourse, however, the station officers began to question defendant. This constituted custodial interrogation. (*Rhode Island* v. *Innis*, *supra*, 446 U.S. at p. 301 [64 L.Ed.2d at p. 308]; see *Pennsylvania* v. *Muniz* (1990) 496 U.S. 582, 602, fn. 14 [110 L.Ed.2d 528, 552, 110 S.Ct. 2638] [" 'Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' "].) Accordingly, because defendant had invoked his right to counsel, the prosecution was then required to further demonstrate by a preponderance of the evidence that defendant made a knowing and intelligent waiver of this right "under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." (*Edwards* v. *Arizona*, *supra*, 451 U.S. at p. 486, fn. 9 [68 L.Ed.2d at p. 387]; *id.* at p. 484 [68 L.Ed.2d at pp. 385-386] ["the voluntariness of . . . an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries"]; cf. *Arizona* v. *Roberson* (1988) 486 U.S. 675, 687 [100 L.Ed.2d 704, 717, 108 S.Ct. 2093] ["we attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel"].) We conclude after independent review that while defendant's statement continued to be voluntary after this interrogation began, there was no such knowing and intelligent waiver.

██ While the fact that defendant initiated the conversation with the officers is strong and essential evidence of a knowing and intelligent waiver, it is not dispositive. Rather, *Edwards* requires that a waiver be found to be knowing and intelligent "under the totality of the circumstances, *including* the necessary fact that the accused, not the police, reopened the dialogue with the authorities." (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 486, fn. 9 [68 L.Ed.2d at p. 387], italics added; see *Oregon* v. *Bradshaw* (1983) 462 U.S. 1039, 1044 [77 L.Ed.2d 405, 412, 103 S.Ct. 2830] (plur. opn. by Rehnquist, J.) [Even if the accused initiates conversation, "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."].) "[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals . . . the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran* v. *Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 421, 106 S.Ct. 1135].) "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (*Id.* at pp. 422-423 [89 L.Ed.2d at 422], fn. omitted.)

██ We see no evidence that at the time the station officers questioned defendant, he possessed "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran* v. *Burbine, supra,* 475 U.S. at p. 421 [89 L.Ed.2d at p. 421].) First, the officers did not advise defendant of his *Miranda* rights before they started to question him. (*Wyrick* v. *Fields* (1982) 459 U.S. 42, 44, 47-48 [74 L.Ed.2d 214, 216-219, 103 S.Ct. 394]; cf. *People* v. *Sims, supra,* 5 Cal.4th at p. 446 [prior to commencement of second interrogation, which defendant initiated, defendant received and expressly waived *Miranda* rights].) While it is not clear that *Miranda* warnings are always required to find a knowing and intelligent waiver of the right to counsel, their absence under the circumstances of this case weakens the claim that defendant made such a waiver. Thus, in *Wyrick* v. *Fields, supra,* 459 U.S. at pages 43-44 [74 L.Ed.2d at pages 216-217], the defendant who had previously invoked his right to counsel, requested a polygraph exam. Prior to undergoing the exam, Fields was given a written consent document, which he signed, informing him of his *Miranda* rights. (*Id.* at p. 44 [74 L.Ed.2d at pp. 216-217].) In addition, a detailed statement was read to Fields which reiterated and explained these rights. (*Ibid.*) Under the totality of these circumstances, the high court concluded that Fields had knowingly and intelligently waived his right to

counsel, and that additional *Miranda* warnings were not required before Fields was interrogated following the polygraph exam. (*Id.* at pp. 47-48 [74 L.Ed.2d at pp. 218-219].) The court reasoned, "the questions put to Fields after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before." (*Id.* at p. 49 [74 L.Ed.2d at p. 219]; *Oregon* v. *Bradshaw*, *supra*, 462 U.S. at p. 1046 [77 L.Ed.2d at p. 413] [The officer "immediately reminded the accused that '[y]ou do not have to talk to me,' and only after the accused told him he 'understood' did they have a generalized conversation. [Citation.] On these facts we believe that there was not a violation of the *Edwards* rule."]; see also *Patterson* v. *Illinois* (1988) 487 U.S. 285, 293 [101 L.Ed.2d 261, 272, 108 S.Ct. 2389] ["we are convinced that by admonishing petitioner with the *Miranda* warnings, respondent has met this burden and that petitioner's waiver of his right to counsel at the [postindictment] questioning was valid" [fn. omitted]].) In contrast here, while defendant had been read his *Miranda* rights two hours earlier, he had then invoked his right to counsel, and been told that the continuing interrogation was "off the record." Nothing in defendant's responses to the station officers' questions indicates that he now intended to waive that right to counsel. Nor did the station officers remind defendant that he did not have to speak to them.

Moreover, during the final interrogation with Detective Arnold on April 20, defendant began the interview by asking, "Ok, everything I've said so far is off the record, right?" He was told, "That's correct." We can therefore infer that defendant did not believe that in responding to the station officers' questions he had made a statement that could be used against him. While this does not affect the *voluntariness* of the statement, it does indicate whether there was a knowing and intelligent waiver of his right to counsel prior to the interrogation.

We conclude after independent review that under these circumstances the prosecution failed to establish by a preponderance of the evidence that defendant knowingly and intelligently waived his right to counsel.

We further conclude, however, that introduction of this portion of the statement was harmless beyond a reasonable doubt. (*People* v. *Sims*, *supra*, 5 Cal.4th at p. 447.) Officer Gordon's testimony at trial varied slightly from that at the pretrial hearing. The statement presented at trial included defendant's admission that he did not feel sorry for what he had done, that Kokes had not provoked the attack, that she died when he slit her throat, that he then stabbed her in the chest "to be sure," that he did not remember cutting off her breast, but if they said so he guessed he had done it, that having intercourse with a person gasping for air was "okay," his sorrow that the

victim's child would grow up without a mother, his concern that the officers not call his parents, and that he had been drinking, but was not drunk. This evidence was essentially duplicative of defendant's April 20 statement to Detective Arnold, which we conclude was fully admissible, in which he described raping and sodomizing Kokes while she choked on her blood and gasped for air, and in which he stated that "I did kill somebody and what I did it bothers me, but it bothers me more to know that I don't get along with my parents and stuff"; forensic evidence that Kokes was stabbed, her throat slit, and that defendant's teeth fit the bite pattern where Kokes's nipples had been removed; and testimony that defendant had been drinking, but appeared to retain full use of his faculties. Moreover, the evidence of defendant's guilt for Kokes's murder was overwhelming. Most importantly, defendant gave a detailed description of the attack in his April 20 statement. In addition, a wooden knife handle tainted with blood that was consistent with Kokes's was found in defendant's pocket on the night of the murder, blood on his clothes and shoes was consistent with her blood, his fingerprint was found inside Kokes's apartment, and his semen was consistent with that found in the victim. He also possessed Kokes's driver's license and other personal items.

Defendant next contends that his booking statement was "inextricably linked" to his first statement, and therefore the "second confession should have been excluded as the inadmissible tainted product of the first unlawful interrogation." Defendant did not make this argument below, and it is therefore waived. (See *People* v. *Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846].) We also reject the claim on the merits. We conclude below that because the three interrogations preceding defendant's *fourth* statement to Detective Arnold were voluntary, we need not consider whether his fourth statement was the tainted product of these interrogations. Accordingly, we need not consider whether defendant's booking statement, which was his *second* statement, was so tainted.

### 2) *Statement to Detective Arnold*

 Defendant contends that his fourth statement, made on April 20 to Detective Arnold, was the tainted product of earlier illegal interrogations, was involuntary and the result of repeated psychological coercion, and was obtained by police lies regarding when defendant would see a public defender. We conclude the statement was properly admitted.

Defendant first contends that the fourth statement was the tainted product of his earlier statements to Detective Riehl, Station Officers Gordon and Denby, and Detective Hooks. We disagree.

In *Oregon* v. *Elstad, supra,* 470 U.S. 298, the United States Supreme Court held that the Fifth Amendment does not require the "suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." (*Id.* at p. 303 [84 L.Ed.2d 228].) In so doing, the high court noted that the " 'prophylactic *Miranda* warnings . . . are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." ' " (*Id.* at p. 305 [84 L.Ed.2d at pp. 229-230].) Thus, "[a] *Miranda* violation does not constitute coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 307, fn. 1 [84 L.Ed.2d at p. 231], italics omitted.) "But the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as *inherently* tainted." (*Id.* at p. 307 [84 L.Ed.2d at p. 231], italics added.) Rather, if the defendant's un-*Mirandized* statement is voluntary, the "absence of any coercion or improper tactics undercuts the twin rationales—trustworthiness and deterrence—for a broader rule. Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 308 [84 L.Ed.2d at p. 232].)

Here, of course, defendant did receive *Miranda* warnings before his first statement, and invoked his right to counsel. We agree with the trial court that Detectives Riehl and Hooks violated defendant's rights under *Edwards* v. *Arizona, supra,* 451 U.S. at pages 484-485 [68 L.Ed.2d at pages 385-387], by continuing to interrogate him, and that these statements were properly suppressed. We disagree with the trial court that the station officers' questions were not interrogation and have concluded after independent review that while defendant's statement in response to these questions was voluntary, he did not knowingly and intelligently waive his right to counsel. Thus this interrogation was also in violation of *Edwards.*

However, just as a failure to give *Miranda* warnings does not in and of itself constitute coercion (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 307, fn. 1 [84 L.Ed.2d at pp. 230-231]), neither does continued interrogation after a defendant has invoked his right to counsel, or an *Edwards* violation, inherently constitute coercion. (*Edwards* v. *Arizona, supra,* 451 U.S. at pp. 484-485 [68 L.Ed.2d at pp. 385-387].) *Edwards,* like *Miranda,* "is a prophylactic rule, designed to implement pre-existing rights." (*Solem* v. *Stumes* (1984) 465 U.S. 638, 644, fn. 4, 645 [79 L.Ed.2d 579, 588, 104 S.Ct. 1338]; *Connecticut* v. *Barrett* (1987) 479 U.S. 523, 528 [93 L.Ed.2d 920, 927-928, 107 S.Ct. 828] [when accused states he wants an attorney, "prohibition on

further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose."].) "The rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures. *Edwards* conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of *Miranda* in practical and straightforward terms." (*Minnick* v. *Mississippi* (1990) 498 U.S. 146, 151 [112 L.Ed.2d 489, 496, 111 S.Ct. 486].)

The United States Supreme Court itself has observed that "the *Edwards* rule cannot be said to be a *sine qua non* of fair and accurate interrogation." (*Solem* v. *Stumes, supra,* 465 U.S. at p. 644 [79 L.Ed.2d at p. 587].) "The fact that a suspect has requested a lawyer does not mean that statements he makes in response to subsequent police questioning are likely to be inaccurate. Most important, in those situations where renewed interrogation raises significant doubt as to the voluntariness and reliability of the statement and, therefore, the accuracy of the outcome at trial, it is likely that suppression could be achieved without reliance on the prophylactic rule adopted in *Edwards.* . . . *Edwards* did not confer a substantive constitutional right that had not existed before; it 'created a protective umbrella serving to enhance a constitutional guarantee.' " (*Id.* at p. 644 & fn. 4 [79 L.Ed.2d at p. 588], citation omitted.)

Thus, we cannot conclude that an *Edwards* violation, "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 309 [84 L.Ed.2d at p. 232].) Rather, if the statement made after an *Edwards* violation is voluntary, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (*Ibid.*)

### 3) *Statements to Detectives Riehl and Hooks*

■ We therefore proceed to determine whether defendant's statements to Detective Riehl and Detective Hooks were voluntary. If so, the admissibility of defendant's statement to Detective Arnold turns on whether it was also voluntary, and whether defendant's waiver of the right to counsel was knowing and intelligent. (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 309 [84

L.Ed.2d at 232].) As noted above, we have already determined after independent review that defendant's booking statement was voluntary.[3] (See *ante*, p. 1035.)

■ To determine whether a statement was voluntary or coerced, we examine the totality of the circumstances. (*Moran* v. *Burbine, supra*, 475 U.S. at p. 421 [89 L.Ed.2d at pp. 420-421].) Coercive police activity is a necessary predicate but does not itself compel a finding that a resulting confession is involuntary. (*Colorado* v. *Connelly, supra*, 479 U.S. at pp. 164, fn. 2, 167 [93 L.Ed.2d. at pp. 482, 484-485].) While the fact that a statement was obtained despite the defendant's invocation of the right to counsel is one of the circumstances we consider, it also is not dispositive. (See *Oregon* v. *Elstad, supra*, 470 U.S. at p. 307, fn. 1 [84 L.Ed.2d at p. 231] ["A *Miranda* violation does not *constitute* coercion"]; *Withrow* v. *Williams* (1993) 507 U.S. 680, 693-694 [123 L.Ed.2d 407, 420, 113 S.Ct. 1745] [voluntariness analysis includes considering "failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation."].) The Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." (*Oregon* v. *Elstad, supra*, 470 U.S. at pp. 304-305 [84 L.Ed.2d at p. 229].)

■ We conclude after independent review that both defendant's statement to Detective Riehl and his statement to Detective Hooks were voluntary. Defendant had only been in custody six hours when he made his statement to Detective Riehl; approximately eleven when he confessed to Detective Hooks. (Cf. *Arizona* v. *Roberson, supra*, 486 U.S. at p. 686 [100 L.Ed.2d at p. 716] [presumption of coercion created by prolonged police custody].) In addition, once Detectives Riehl and Hooks told defendant their conversations were "off the record," he demonstrated no hesitation in speaking with them. As the trial court noted, "The tapes clearly indicate a[n] eagerness to talk all right, and just tell everything that probably could be told, so from that standpoint of voluntariness, there isn't any question about that." The court further noted, "There isn't any excitement in the voice. There isn't any nervousness particularly. There isn't any outward sign of stress. It is just a straight account of what happened, and there is the same tone which prevailed throughout the three tapes. It is unexcited, unforced and voluntary . . . ." (See *People* v. *Belmontes* (1988) 45 Cal.3d 744, 774

---

[3]We recognize that in *People* v. *Sims, supra*, 5 Cal.4th at pages 444-446, we analyzed the issue of whether certain incriminating statements initiated by the defendant a day after an *Edwards* violation were admissible by considering whether they were "the tainted product of" the first confession. The fact that we chose to perform a more stringent attenuation analysis in that case, however, does not preclude us from now concluding it is not necessary to do so when the statement immediately following the *Edwards* violation is voluntary.

[248 Cal.Rptr. 126, 755 P.2d 310] [defendant's own behavior and statements "virtually preclude[] a conclusion that his free will was overborne by the substance or manner of the interrogation"]; *People* v. *Thompson* (1990) 50 Cal.3d 134, 170 [266 Cal.Rptr. 309, 785 P.2d 857] [noting "tone of the interrogation was restrained and noncoercive"].)

As noted, the trial court found that defendant's statement to Detective Hooks was the "product of improper police tactics," and that the prosecution had not demonstrated by a preponderance of the evidence that the statement was voluntary. Extrapolating from the court's earlier remarks, these "improper tactics" were apparently Hooks's reinterrogation of defendant despite the fact that he had invoked his right to counsel, and a concern that Hooks had tried too hard to establish a sympathetic rapport with defendant. The court stated, "During the hearing the court expressed an opinion about how the testimony of Hooks was amazing. I can't imagine why in a delicate situation involving the death penalty that an . . . investigator would intermeddle in such a sensitive area. And not only did he do that, he did it with the full approval of the superior officer, the ones who were handling the case. He said he asked if he could talk to defendant, and they—I don't know whether they encouraged him or not, I don't know if it was intentional, but the tapes clearly indicated an ingratiating purpose, a sympathy being expressed. Again, I can't imagine why someone would on his own get into such an area which caused so much trouble. To me that was almost outrageous." The trial court continued, "[A]ll of a sudden Hooks comes here, whether he intended to or not, can almost be regarded as typical softening up, a very sympathetic officer comes in the room and gives him a cigarette, and tells him how rough [the cigarettes] are, talking about drinking whiskey, and things like that . . . ." "[I]t is just the tactics [by Detective Hooks] which were used should that be sufficient enough to say, 'Well, that is something which would ordinarily be characterized as voluntary is not because of the tactics.' " The court stated, however, "I'm not going to go to the extent of saying there was coercion in the sense of a person's will was broken down."

We agree that Detective Hooks's (and Detective Riehl's) conduct in *deliberately interrogating defendant after defendant had invoked his right to* counsel was unethical and it is strongly disapproved. Such conduct is only relevant to defendant's voluntariness, however, to the extent it deprived defendant of the ability to freely and deliberately choose to speak with either detective. (Cf. *Moran* v. *Burbine, supra,* 475 U.S. at pp. 421, 423-424 [89 L.Ed.2d at pp. 420-423].) As the trial court noted, defendant's "will was [not] broken down," and "[t]he tapes clearly indicate [defendant's] eagerness to talk . . . ."

Nor would we conclude that Hooks's efforts to establish a rapport with defendant constitute coercion. Discussions of whisky and tobacco are not interrogation techniques " 'so offensive to a civilized system of justice that they must be condemned.' " (*Colorado* v. *Connelly, supra,* 479 U.S. at p. 163 [93 L.Ed.2d at p. 481], quoting *Miller* v. *Fenton* (1985) 474 U.S. 104, 109 [88 L.Ed.2d 405, 410, 106 S.Ct. 445]; see *People* v. *Thompson, supra,* 50 Cal.3d at p. 169 [officer's statement, " 'if you truly loved her, you wouldn't allow her to sit here in jail if you knew information that would help her,' " and reference to girlfriend's "fragile mental condition" with suggestion that "further incarceration could 'really break her' " did not induce defendant's incriminating statements several hours later].)

### 4) *Statement to Detective Arnold*

We further conclude after independent review that defendant's fourth statement, made on April 20 to Detective Arnold, was voluntary, and that he knowingly and intelligently waived his right to counsel. As for voluntariness, defendant initiated the interrogation. (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 485 [68 L.Ed.2d at p. 386-387].) Moreover, he responded to Detective Arnold's question, "Why did you want to talk with us?" by saying, "I had some questions and I'll probably talk, I don't know." This statement indicates, as the trial court observed, that defendant did not feel that his prior statements had made his current confession a foregone conclusion. Finally, as we have already noted, the tape of this interrogation "clearly indicate[d] [defendant's] eagerness to talk . . . ."

Defendant contends, however, that his fourth statement was involuntary because it was the product of psychological coercion. In particular, defendant asserts, "The detectives strongly implied that [defendant] would be treated leniently, and would receive help for his mental and substance abuse problems, if he confessed and discussed fully the circumstances of his crimes." Our review of the record does not support this conclusion.

In particular, defendant asserts that "Detective Riehl encouraged [defendant] to make a full confession in order to bring out mitigating circumstances, convince the police that he killed [Kokes] in the 'heat of passion,' rather than with cold blooded premeditation, and obtain help with his problems." We discern no reference in Detective Riehl's remarks regarding obtaining help for defendant's "problems"; to the extent defendant is referring to Detective Arnold's comment during the first interrogation, "Well, maybe you can get some help where you're going," we find nothing untoward in that remark.

As for the Detective Riehl's reference to "heat of passion," our review of these remarks in context is that the detective was asking the defendant to

describe what happened. This is qualitatively different from the kind of interrogation we have found constitutes psychological coercion. (See *People v. McClary* (1977) 20 Cal.3d 218, 229 [142 Cal.Rptr. 163, 571 P.2d 620], overruled on other grounds in *People* v. *Cahill* (1993) 5 Cal.4th 478, 510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037] [police repeatedly branded 16-year-old suspect a liar, implied that unless she changed her statement and admitted true extent of complicity she would be charged as a principal to murder and would face the death penalty, and failed to respond to her repeated requests for counsel during first interview; given these statements and the short time period between interviews during some of which time suspect was in officers' presence, statements made in second interview initiated by defendant were involuntary].)

Defendant also asserts that "Detective Hooks also encouraged [defendant] to confess and strongly implied that, if he did so, . . . he could escape the death penalty." We do not believe that defendant could reasonably have so understood Hooks's comments. For example, during this conversation, Detective Hooks said, "I'm going to be up front with you about what happens and about what is going to happen in that I don't know what's going to happen at this point." Defendant inquired, "What can happen?" Hooks said, "Well, it can go anywhere from, and this is just my opinion, I'm not telling you what's going to happen, it can go anywhere from a 2nd degree murder to a 1st degree murder, which basically, a 1st degree murder is more severe, as you can imagin[e]. It's hard to tell, it really is with these things. Once we get into court, the lawyers are judges, everything is going to be considered. Specifically, your drinking, how much you had, if you'd done this kind of thing before. If there's a trail o[f] girls laying from here to Colorado, then it doesn't look too good for you." Later in the conversation, defendant asked, "Like I talked to one detective who was saying maybe we can't see what we can't do." Hooks replied, "Sure, down the road and like I say he's not making you any promises of leniency or anything else. You're gonna have to pay for what you did, there's no doubt about that, you understand that . . . ."

Defendant also asserts that "Detective Arnold told [defendant] that, if he confessed fully, there was at least a distinct possibility that he could be placed in a mental institution and get help for his problems." However, Detective Arnold's reference to the broad spectrum of possible places of incarceration would not reasonably be understood as a promise. Indeed, shortly after hearing this statement, defendant acknowledged that no promises or threats had been made to him.

Defendant asserts that "Although these detectives tried to 'cover' themselves by stating that they were not making any express guarantees of

leniency, the implication of these statements was clear." To the contrary, we believe defendant would reasonably understand these statements to mean that no promises or guarantees were being made. As we have just noted, defendant acknowledged in his interview with Detective Arnold that no promises had been made to him.

Finally, defendant asserts that the implication of the above statements "amounted to psychological coercion deliberately calculated to break the resistance of a totally inexperienced defendant with residual brain damage and chronic alcohol and cocaine addictions." ■ Of course, "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." (*Colorado* v. *Connelly, supra,* 479 U.S. at p. 165 [93 L.Ed.2d at p. 483].) ■ Having concluded no coercive threats or promises were made, we cannot conclude that defendant's statement was involuntary solely because of any alleged physical or mental condition. (*Id.* at p. 164 [93 L.Ed.2d at pp. 482-483].)

As for a knowing and intelligent waiver, we again consider the "necessary fact" that defendant initiated the interview. (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 486, fn. 9 [68 L.Ed.2d at p. 387].) In addition, defendant was repeatedly informed of and expressly waived his right to counsel. (*Ibid.*) Thus, after independent review, we conclude the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran* v. *Burbine, supra,* 475 U.S. at p. 421 [89 L.Ed.2d at p. 421].)

Defendant's claim that his statement was rendered involuntary or his waiver vitiated by the fact that the police misinformed him of when counsel would be provided is disposed of easily. Defendant was repeatedly told that a public defender would be appointed for him when he was arraigned on Thursday, April 21. That is in fact when his right to counsel attached. (*United States* v. *Gouveia* (1984) 467 U.S. 180, 185, 187 [81 L.Ed.2d 146, 152-154, 104 S.Ct. 2292]; see *Duckworth* v. *Eagan* (1989) 492 U.S. 195, 203-204 [106 L.Ed.2d 166, 177-178, 109 S.Ct. 2875] [informing defendant attorney would be appointed " 'if and when you go to court' " accurately described that state's procedure for appointment of counsel; such language in *Miranda* warnings simply anticipated question regarding when defendant would obtain counsel].) Moreover, unlike *Pope* v. *Zenon* (9th Cir. 1995) 69 F.3d 1018, 1021-1022, 1024-1025, on which defendant relies, defendant was told repeatedly he had the right to have an attorney present during the interrogation. While the police *could* have informed defendant he was free to contact the public defender's office prior to his arraignment, "we have never

read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." (*Moran* v. *Burbine, supra,* 475 U.S. at p. 422 [89 L.Ed.2d at p. 421].) Rather, "full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process . . . ." (*Id.* at p. 427 [89 L.Ed.2d at p. 424].) The *Miranda* rules do not also require the police to keep a suspect abreast of his various options for legal representation. (*Id.* at p. 427 [89 L.Ed.2d at p. 425]; *Duckworth* v. *Eagan, supra,* 492 U.S. at p. 204 [106 L.Ed.2d at pp. 1777-178] [*Miranda* requires only that suspect be informed he has the right to an attorney before and during questioning, and that an attorney will be appointed for him if he cannot afford one].)

In sum, we reject defendant's claim that his fourth statement was the tainted product of earlier illegal interrogations, a product of psychological coercion, or obtained by police lies regarding when defendant could see an attorney.

2. *Hovey Voir Dire Procedure*

 Defendant contends that the trial court committed error warranting "a reversal of both the guilt phase and penalty phase determinations" in conducting *Hovey* voir dire in a closed courtroom, with only the prospective juror, trial judge, defendant, and counsel present. (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301].) Defendant contends that "the Hovey private questioning procedure violated his right to a public trial as guaranteed by" the federal and California Constitutions, "and is grounds for a per se reversal." He did not, however, object to the procedure below. (*People* v. *Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

As defendant acknowledges, we have previously held that a failure to object constitutes a waiver of the right to a public trial. (*People* v. *Thompson, supra,* 50 Cal.3d at p. 157; see *People* v. *Edwards* (1991) 54 Cal.3d 787, 811-813 [1 Cal.Rptr.2d 696, 819 P.2d 436].) However, relying on *People* v. *Ernst* (1994) 8 Cal.4th 441 [34 Cal.Rptr.2d 238, 881 P.2d 298], he asserts that we should reconsider these holdings "because the right to a public trial, like such other fundamental constitutional rights as the right to counsel and the right to a jury trial, can only be waived expressly and by the defendant personally on the record." Our decision in *Ernst,* however, was premised on "the precise terms of the California Constitution" (*id.* at p. 448), which provide that, "A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's

counsel." (Cal. Const., art. I, § 16.) No such personal waiver is expressly required to waive the right to a public criminal trial. (*People* v. *Edwards*, *supra*, 54 Cal.3d at p. 813.)

### 3. *Witt-Witherspoon Challenges*

Defendant contends the trial court committed error warranting reversal of both the guilt phase and penalty phase determinations in excusing three prospective jurors, Leona Nissen, Barbara Ragsdale, and Peter Slutzky, for cause. Not so.

A prospective juror "may be challenged for cause based upon his or her views concerning capital punishment only if those views would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844].) "On appeal, if the prospective juror's responses are equivocal, i.e., capable of multiple inferences, or conflicting, the trial court's determination of that juror's state of mind is binding." (*People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) If there is no inconsistency, and the only question is whether the prospective juror's responses in fact demonstrated an opposition to or bias in favor of the death penalty, we will not set aside the court's determination if it is supported by substantial evidence and hence not clearly erroneous. (*People* v. *Cooper*, *supra*, 53 Cal.3d at p. 809.)

*Prospective Juror Leona Nissen*

In response to the defense counsel's inquiry, prospective juror Leona Nissen stated that she could imagine voting for the death penalty in a case of premeditated murder. The prosecutor subsequently asked her, "Are there any other kinds of crimes that you could see yourself voting for the death penalty for?" "Not right off." "I'm sorry?" "Not that I can think of right at the moment."

The prosecutor also asked, "Do you think that the kind of crime where somebody is murdered in the course of being sodomized is that the kind of a crime that you could see yourself voting for the death penalty?" "Not necessarily, no. . . . [¶] [I]f there was just the rape and the murder then probably definitely not, but if there was all three, or premeditation and everything together, it depends on how strong the evidence would be." "But

you would require there to be more than just a rape?" "Yes." "Or you would require more than just sodomy?" "Yes." The prosecutor hypothesized a situation where the jury found defendant guilty of murder with only the special circumstance of murder in the commission of rape true. "Could you vote for death knowing that it was only one count that the jury came back guilty with?" "I don't think so." "The answer is no?" "Yes." "You would not?" "No."

The trial court sustained the prosecution's challenge for cause, noting, "I watched Miss Nissen very closely during this because obviously she gave somewhat conflicting answers to both counsel, and I'm convinced by her answers and by her demeanor that she will require more than—she wouldn't be able to follow the law in this case, and she would require more than what the law sets forth . . . ."

We conclude this prospective juror was not improperly excused. To the extent Nissen's answers were equivocal or conflicting, we are bound by the trial court's determination. To the extent they were not so, substantial evidence supports the trial court's conclusion. Contrary to defendant's assertion, Nissen did not indicate that she was able to put aside her personal feelings about the death penalty and follow the court's instructions and the law.

*Prospective Juror Barbara Ragsdale*

Prospective juror Barbara Ragsdale stated that in order to impose the death penalty, she "would have to truly, truly believe there was absolutely no way in which this person would ever be able to function. . . . In any way, in a prison situation, in any situation. . . ." The prosecutor asked, "So the only way you would vote for the death penalty as being the proper or just penalty as far as you were concerned would have to be proven to you that this person could not function in a prison setting because your other choice would be life without the possibility of parole, and anything short of that you would not vote for the death penalty?" Ragsdale responded, "Probably not."

Ragsdale then appeared to express the opinion that to impose the death penalty, defendant's guilt would have to be demonstrated "beyond a shadow of a doubt." In response to the trial court's inquiry, she said, "I think, I think the problem you said it when you said it's upon the state to prove not beyond a shadow of doubt like I said, but at the lesser thing, and I said to you, you would have to prove to me beyond a shadow of a doubt." The trial judge asked, "If the court were to instruct you that . . . the burden of proof that you were to follow is beyond a reasonable doubt, would you be able to

follow that instruction?" Ragsdale responded, "That is where I think I have a problem. I think I would have to follow my own conscience. . . . You are telling me that this is not beyond a shadow of a doubt, but with a lesser thing that you would have to prove, and I'm saying to you that in this circumstance, I will have to follow my own conscience." "Which is it would have to be proved to you beyond a shadow of a doubt." "And I know myself well enough that this would have to be. I have been in this circumstance before." After further voir dire, the court asked, "Do you understand that the law requires proof beyond a reasonable doubt and to a moral certainty, but it's reasonable doubt? You are telling me, I believe, that your conscience requires you to have proof beyond a shadow of a doubt?" "That's right."

The trial court sustained the prosecution's challenge for cause noting, "I found her to be very undecisive at the beginning. I think as the questioning went on, she came to the realization that her conscience would not allow her to be satisfied with anything other than proof beyond a shadow of a doubt, and she realizes there is a difference between proof beyond a reasonable doubt and proof beyond a shadow of a doubt."

We conclude this prospective juror was not improperly excused. To the extent Ragsdale's answers were equivocal or conflicting, we are bound by the trial court's determination. To the extent they were not so, substantial evidence supports the trial court's conclusion. Contrary to defendant's assertion, Ragsdale did not indicate that she was able to put aside her personal feelings about the death penalty and follow the court's instructions and the law.

### Prospective Juror Peter Slutzky

Defense counsel asked prospective juror Peter Slutzky, "What is your view on the death penalty?" Slutzky responded, "That it should not be used for punishment, and it's not effective as a deterrent, but for certain people who have the propensity to murder people, that society has the right to protect itself, and since people can kill in prison, or there is a chance that somebody who has the propensity to kill could escape from prison and kill again, since we don't have the means for rehabilitation, that the only alternative at this time is to kill that person."

Subsequently, defense counsel asked Slutzky about a situation where "there was no evidence presented by anybody, talking about propensities" to kill again. Slutzky replied, "Then I—I would guess that my decision would be against the death penalty." Counsel asked, ". . . Do you think that you could consider imposing the death penalty even if you heard no evidence

regarding propensities at all?" "I think not." "So that is the only key to you?" "Yes." Counsel asked, "But if you were shown no evidence by either side about propensity to do any future crime, you know, murders, you would not impose the death penalty? Is that kind of your view?" "I would say that is a fair evaluation." Slutzky reiterated these views when questioned by the prosecutor and the trial judge.

The trial court sustained the prosecutor's challenge for cause, noting that Slutzky "was very nervous at the end. His legs were shaking and he was shaking. I think based on not only his answers but on his demeanor, I think he has very strong views, and he wasn't fully able to articulate them, but his views were—it was obvious from the way he was shaking, they were very strong. . . . Based on his answers and his demeanor, his views would prevent or substantially impair the performance of his duty as a juror in accordance with the instructions and the oath."

We conclude this prospective juror was not improperly excused. Slutzky's answers were neither equivocal nor conflicting, and substantial evidence supports the trial court's determination. Contrary to defendant's assertion, Slutzky did not indicate that he was able to put aside his personal feelings about the death penalty and follow the court's instructions and the law.

### 4. *Admission of Victim and Surrounding Crime Scene Photographs*

 Defendant contends that the trial court erred in admitting irrelevant, inflammatory, and cumulative photographs of Kokes's body and the surrounding crime scene. The record does not reflect that defendant raised these objections below to each of the now challenged exhibits.[4] In any event, we conclude on the merits that there was no error.

The photographs were relevant to the prosecution's case. Here, the first degree murder charges were tried under the theory that the killing was premeditated or perpetrated during a rape, sodomy and/or burglary. In addition, the special circumstances alleged included murder in the commission of rape and/or sodomy. "The photographs were pertinent because they showed the nature and placement of the fatal wounds [citations] and the sexually suggestive position in which" Kokes was found. (*People* v. *Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643].) In addition,

---

[4]Defendant identifies the challenged photographs only by reference to his previously filed California Rules of Court, rule 10(d), request to call up certain exhibits. This request was granted. The exhibits include photographs and a drawing, and depict objects other than Kokes's body and the surrounding crime scene. Because defendant's argument on appeal is limited to the photographs of Kokes's body and the surrounding crime scene, we address only these exhibits.

the photographs corroborated defendant's statements regarding how the murder occurred, and clarified the coroner's and other witnesses' testimony regarding Kokes's wounds. (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 132.) Contrary to defendant's assertion, the prosecution was not obligated to accept antiseptic stipulations in lieu of photographic evidence. (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 133; *People* v. *Pride, supra,* 3 Cal.4th at p. 243.)

Nor did the trial court err in concluding that the probative value of the photographs outweighed their prejudicial impact. We have independently reviewed the photographs and conclude they were not unduly gruesome or inherently inflammatory. (*People* v. *Cain* (1995) 10 Cal.4th 1, 29 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People* v. *Pride, supra,* 3 Cal.4th at p. 243.)

Finally, the photographs were not cumulative. "We often have rejected the contention that photographs of a murder victim must be excluded as cumulative simply because testimony also has been introduced to prove the facts that the photographs are intended to establish." (*People* v. *Crittenden, supra,* 9 Cal.4th at pp. 134-135.)

### 5. *Claim of Ineffective Assistance of Counsel*

Defendant contends that trial counsel was ineffective in failing to object to Beerman's reference to defendant's outstanding Arkansas warrant, and that this failure to object requires a reversal of his conviction. No ineffective assistance of counsel is demonstrated.

A defendant claiming ineffective assistance of counsel must first establish that "counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052].) He must then establish prejudice: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] . . . [¶] . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at pp. 693-694 [80 L.Ed.2d at pp. 697-698]; *People* v. *Clair, supra,* 2 Cal.4th at p. 653, fn. 2; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839].)

Here, Beerman testified twice on direct during the guilt phase to the effect that defendant "didn't want to deal with the police [on the night of

the murder] because he said he had a warrant out for his arrest in Arkansas. . . . He said it was from not paying a fine or something. He said he had a felony warrant out or something."

At the penalty phase, defense counsel successfully argued that the prosecution be precluded from introducing a letter that referenced defendant's Arkansas custody. At that time counsel noted that he had deliberately failed to object to Beerman's testimony in the guilt phase, stating Beerman "mentioned it . . . in the context of a payment of a fine out of the Arkansas matter. I just left it alone because it didn't allude to anything more than that, and it was something I certainly didn't want to bring up in front of the jury by making any type of objection."

■ " 'Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People* v. *Zapien* (1993) 4 Cal.4th 929, 980 [17 Cal.Rptr.2d 122, 846 P.2d 704].) ■ Here, counsel's decision not to highlight the testimony to the jury by objecting, particularly in light of the fact that Beerman had characterized defendant's Arkansas criminal background as involving an innocuous fine, is a valid tactical reason for counsel's challenged omission.

Defendant contends that counsel should have moved to exclude this evidence *in limine*. However, defendant does not assert that counsel knew Beerman would make this statement. Rather, he states that "nothing in the record suggests" that counsel could not have found this evidence through "normal pretrial discovery and investigation." Failure to discover every potentially negative statement that a witness may make does not demonstrate deficient performance. Indeed, Beerman's testimony arguably assisted defendant in that it minimized his criminal past, and gave defendant a reason for avoiding the police on April 18 other than his consciousness of guilt for Kokes's murder.

In any event, defendant has failed to demonstrate prejudice. In light of the overwhelming evidence of defendant's guilt, there is no reasonable probability that but for counsel's failure to object to Beerman's comments, the result of the proceeding would have been different.

### 6. *Claim Regarding Defendant's Right to Testify*

■ Defendant contends that the trial court committed reversible error by failing to sua sponte inform him of his right to testify and to obtain an express personal waiver of that right. We have held that a trial court has no

such duty. (*People* v. *Alcala* (1992) 4 Cal.4th 742, 805-806 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) "When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.' " (*Ibid.*)

Defendant asserts, however, that we should revisit this conclusion in light of *People* v. *Ernst, supra,* 8 Cal.4th 441, in which we held that a defendant's right to a jury trial must be personally waived by the defendant. He argues that "[t]here is no reason why such an express waiver rule should not also apply to the equally fundamental right to testify." Our decision in *Ernst,* however, was premised on "the precise terms of the California Constitution" (*id.* at p. 448), which provide that, "A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.) No such personal waiver is expressly required for a defendant to waive his right to testify. Rather, "a defendant's right to testify in his own behalf is merely one of many rights guaranteed by the Fourteenth Amendment to the federal Constitution to insure a fair trial [citation]. Like the right to produce evidence and to confront and cross-examine adverse witnesses, it must be exercised with caution and good judgment, and with the advice and under the direction of competent trial counsel. It necessarily follows that a trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy . . . ." (*People* v. *Mosqueda* (1970) 5 Cal.App.3d 540, 545 [85 Cal.Rptr. 346].) If that assumption is incorrect, defendant's remedy is not a personal waiver in open court, but a claim of ineffective assistance of counsel. (*Id.* at pp. 545-546.) Defendant does not assert, nor would the record support, such a claim here.

### 7. *Alleged Instructional Errors*

#### a. *CALJIC No. 2.90*

The trial court instructed the jury in the language of then CALJIC No. 2.90, the standard reasonable doubt instruction.[5] Defendant asserts that in so doing, the trial court violated his procedural due process rights under the federal and state Constitutions, and committed per se reversible error, by

---

[5]The jury was instructed: "Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

instructing the jury that they could take into account moral considerations in determining defendant's guilt or innocence. We have repeatedly upheld the efficacy of this instruction, and defendant cites no persuasive reason to revisit this conclusion. (*Victor* v. *Nebraska* (1994) 511 U.S. 1, 6 [127 L.Ed.2d 583, 591, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155, 185-186 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People* v. *Freeman* (1994) 8 Cal.4th 450, 501-505 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)

### b. *Circumstantial Evidence*

 The jury was instructed in the language of CALJIC Nos. 2.00, 2.01, and 2.02. Defendant asserts that the trial court erred in giving these instructions because "they failed to advise the jury that the inferences drawn from circumstantial evidence must be more likely than not to flow from the proven facts and were thus unconstitutional." We have previously rejected analogous contentions, and have concluded that when the instructions are read in conjunction with the reasonable doubt instruction, and viewed as a whole, they do "not undermine the instructions on the presumption of innocence and the standard of proof beyond a reasonable doubt, and [do] not impermissibly create a mandatory conclusive presumption of guilt." (*People* v. *Wilson* (1992) 3 Cal.4th 926, 942-943 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Ray*, *supra*, 13 Cal.4th at pp. 347-348; *People* v. *Crittenden*, *supra*, 9 Cal.4th at p. 144.)

Defendant asserts, however, that our conclusion should be reconsidered in light of the recent recognition that the reasonable doubt instruction is "hopelessly confusing." We have already rejected defendant's claim regarding the reasonable doubt instruction above, and hence his related argument here likewise fails.

### c. *Flight*

 The jury was instructed in the modified language of CALJIC No. 2.52 as follows: "The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. *If there was such flight*, the weight to which such circumstance is entitled is a matter for the jury to determine." (Italics added.)

Defendant asserts that the trial court erred in giving this instruction because there was no evidence of actual flight. In the alternative, he asserts

that the instruction should have been modified to allow the jury to consider whether defendant had a different reason, other than consciousness of guilt for Kokes's murder, for wanting to leave.

We disagree. In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." (*People* v. *Ray, supra,* 13 Cal.4th at p. 345; § 1127c.) " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 60 [5 Cal.Rptr.2d 495, 825 P.2d 388], quoting *People* v. *Crandell* (1988) 46 Cal.3d 833, 869 [251 Cal.Rptr. 227, 760 P.2d 423].) "*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so." (*People* v. *Turner* (1990) 50 Cal.3d 668, 695 [268 Cal.Rptr. 706, 789 P.2d 887], original italics.)

Here, while defendant did not leave the apartment building in which the murder occurred, he left Kokes's apartment after killing her, told Stevens, "I really got to get the hell out of here," packed his belongings, asked DeLong if he could stay with her near Fresno, and repeatedly pleaded with his roommate to drive him out of town. This is sufficient evidence to warrant instructing the jury to determine whether flight occurred, and, if so, what weight to accord such flight. (See *People* v. *Mason* (1991) 52 Cal.3d 909, 943 [277 Cal.Rptr. 166, 802 P.2d 950].) Moreover, the instruction given adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt.

### d. *Lesser Included Offense of Theft*

Defendant contends that the trial court erred in failing to sua sponte instruct on the lesser included offense of theft, and that his robbery conviction must therefore be reversed. We agree.

"The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." (*People* v. *Cooper, supra,* 53 Cal.3d at p. 827.) "Theft is a lesser included offense of robbery, which includes the additional element of force or fear." (*People* v. *Melton* (1988) 44 Cal.3d 713, 746 [244 Cal.Rptr. 867, 750 P.2d 741].) If intent to

steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent. (*People* v. *Webster* (1991) 54 Cal.3d 411, 443 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Turner*, *supra*, 50 Cal.3d at p. 690.)

 Here, there was evidence that defendant did not form the intent to steal until after Kokes was dead. In his statement, defendant said that he returned to the apartment to kill Kokes. Only after he accomplished that purpose did he take her wallet and makeup bag. Thus, there was evidence that the property was taken after the murder, and that robbery was not the primary motivating factor for the murder. Indeed, the jury found true the special circumstance that defendant killed Kokes to eliminate her as a witness to his sexual assault. (See *People* v. *Kelly* (1992) 1 Cal.4th 495, 514, 529 [3 Cal.Rptr.2d 677, 822 P.2d 385] [defendant's statement to police that he found rings in trash can after raping and murdering victim evidence that intent to steal arose after murder]; cf. *People* v. *Duncan* (1991) 53 Cal.3d 955, 970 [281 Cal.Rptr. 273, 810 P.2d 131] ["[a]ll the evidence points to robbery as the motive for the killing" and only bare speculation supports theory now advanced by defendant that intent to steal did not arise until after victim's death]; *People* v. *Lewis* (1990) 50 Cal.3d 262, 277 [266 Cal.Rptr. 834, 786 P.2d 892] [all evidence pointed to robbery as the motivating factor for murder, and "[t]here was nothing more than sheer speculation to support the scenario now advanced by defendant that the idea of taking the victim's property did not arise until after the victim was dead"].)

 "An error in failing to instruct on lesser included offenses requires reversal unless it can be determined that the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." (*People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351-352 [216 Cal.Rptr. 455, 702 P.2d 613].) No such determination is possible here. This case differs significantly from cases in which we have found a failure to instruct on theft sua sponte harmless. In *People* v. *Turner*, *supra*, 50 Cal.3d at page 691, the jury received instructions on "after-formed intent," first degree felony murder based on robbery, and robbery-murder special circumstance. We concluded that these instructions "made clear beyond doubt that defendant was not guilty of robbery . . . if his intent to steal arose only after the fatal assault." (*Ibid.*) Here, there were no such instructions. Likewise, in *People* v. *Melton*, *supra*, 44 Cal.3d at page 746, defendant was convicted of burglary, and the burglary-murder special circumstance was found true "under instructions that the entry to [the victim's] residence must have been for the purpose of either theft or rob-bery." (Italics omitted.) We concluded that the "jury necessarily determined that defendant formed the intent to steal *before* he assaulted" the victim. (*Id.*

at pp. 746-747, original italics.) By contrast here, defendant was found *not* guilty of burglary, and the burglary-murder special circumstance was found *not* true. The robbery instruction alone "never required [the jury] to decide specifically whether defendant had formed the intent to steal after the assault." (*People* v. *Ramkeesoon, supra,* 39 Cal.3d at p. 352, fn. omitted.)

The Attorney General argues that any error in failing to instruct on theft was invited. During the discussion regarding jury instructions, the trial court asked, "Is there a lesser included . . . [on] robbery?" Defense counsel responded, "The evidence, your honor, just doesn't in my opinion warrant any lessers in this case other than the second degree murder, and that is the only thing I'm asking for."

For the doctrine of invited error to apply, " 'it must be clear from the record that defense counsel made an express objection to the relevant instructions. In addition, because important rights of the accused are at stake, it also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' " (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1234 [249 Cal.Rptr. 71, 756 P.2d 795].) Here, we cannot characterize counsel's response as a request that the trial court omit instruction on lesser included offenses. (Cf. *People* v. *Duncan, supra,* 53 Cal.3d at pp. 969-970.) Rather, it appears that counsel mistakenly believed that the evidence did not warrant any such instruction. No express objection to relevant instructions or tactical choice is apparent.

The robbery conviction is reversed.

### 8. *Cumulative Error*

Defendant contends that even if the errors alleged above are not individually prejudicial, their cumulative effect "combined to irreparably prejudice his right to a fair trial and his constitutional right to a fair trial and due process of law." Not so. We have rejected nearly all of defendant's assignments of error. Except for the robbery conviction, when we have found error, we have concluded defendant was not prejudiced. Defendant "has merely shown that his ' " trial was not perfect—few are." ' " (*People* v. *Cooper, supra,* 53 Cal.3d at p. 839.)

### B. *Penalty Phase*

#### 1. *Alleged Unconstitutionality of Death Sentencing Statute and Process*

Defendant contends that his death sentence must be reversed because it was imposed pursuant to an unconstitutional statute and death sentencing process. We disagree.

Defendant first contends that the death penalty is inherently cruel and unusual punishment in violation of the Eighth Amendment and article I, section 17 of the California Constitution. Defendant acknowledges that we have held that the statute is constitutional. (See, e.g., *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1109 [25 Cal.Rptr.2d 867, 864 P.2d 40]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 188 [158 Cal.Rptr. 281, 599 P.2d 587].) He asserts, however, "that a fair review of California's death penalty statute, and the manner in which it has been carried out since reenacted in 1972, 1977, and 1978, compels the conclusion that the death penalty remains unconstitutional," and invites us to reconsider our decisions and "interpret California's Constitution as prohibiting the death penalty." We decline to do so.

Second, defendant argues that "California's laws defining first degree murder, the class of death eligible defendants, and the aggravating circumstances which the jury may consider in electing to impose the death penalty, as interpreted by this Court, are so broad that they allow virtually every homicide offender to be put to death and fail to perform the 'narrowing' function required by the Eighth Amendment." These claims have been repeatedly rejected. (*Tuilaepa* v. *California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 762, 114 S.Ct. 2630, 2637]; *People* v. *Ray, supra,* 13 Cal.4th at pp. 356-357; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 467-470, 474-479 [24 Cal.Rptr.2d 808, 862 P.2d 808]; *People* v. *Crittenden, supra,* 9 Cal.4th at pp. 154-156.)

Third, relying on *Fierro* v. *Gomez* (N.D.Cal. 1994) 865 F.Supp. 1387, affirmed in *Fierro* v. *Gomez* (9th Cir. 1996) 77 F.3d 301, 309, defendant claims that the use of lethal gas is cruel and unusual punishment. In *Fierro,* the district court held that former section 3604, "to the extent that it requires or permits the imposition of death by administration of lethal gas, violates the eighth and fourteenth amendments of the United States Constitution," and enjoined the state defendants from using lethal gas to execute any California death row inmate. (*Fierro* v. *Gomez, supra,* 865 F.Supp. at p. 1415.) Subsequent to the filing of defendant's reply brief, however, the United States Supreme Court granted certiorari in *Fierro,* vacated the judgment, and remanded the case to the Ninth Circuit "for further consideration in light of . . . [s]ection 3604." (*Gomez* v. *Fierro* (1996) __ U.S. __ [136 L.Ed.2d 204, 117 S.Ct. 285].)[6]

Section 3604, subdivision (b), as amended in 1996, permits an election by persons sentenced to death to have punishment imposed by either lethal gas

---

[6]Defendant filed a request for judicial notice of the evidence and exhibits presented in *Fierro.* That request is hereby denied as moot.

or lethal injection. If the person does not make an election, death is by lethal injection. Thus, defendant will only be executed by lethal gas if he affirmatively chooses that method of execution. He would thereby waive any claim that this method of execution violates the Eighth Amendment. (*Poland* v. *Stewart* (9th Cir. 1996) 92 F.3d 881, 891-892.)

"In any event, the claim must be rejected out of hand as a ground for reversal of the judgment of death. It bears solely on the legality of the execution of the sentence and not on the validity of the sentence itself." (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1110, fn. omitted.)

Finally, in summary fashion and without critical analysis, defendant asserts that several features of California's capital sentencing scheme violate the federal and state Constitutions. We have repeatedly rejected all of these claims, and he asserts no persuasive reason to revisit them. Thus, a jury need not be instructed which factors are aggravating and which are mitigating; find that death is the appropriate sentence beyond a reasonable doubt; find any aggravating factor true beyond a reasonable doubt (except other crimes evidence); unanimously find at least one aggravating factor true; find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt; or make written findings specifying the particular aggravating factor(s) it relied on in selecting the death penalty. (*People* v. *Crittenden*, *supra*, 9 Cal.4th at pp. 152-153.)

### 2. *Claim of Disproportionate Punishment*

 Defendant requests that this court perform an intracase proportionality analysis and conclude that his death sentence was disproportionate in light of his age, background, and the circumstances of this case. (*People* v. *Davenport* (1995) 11 Cal.4th 1171, 1234 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People* v. *Webb* (1993) 6 Cal.4th 494, 536 [24 Cal.Rptr.2d 779, 862 P.2d 779].)

In particular, defendant contends that imposing death on defendant "is grossly disproportionate to the nature of this particular offender because of his almost complete lack of any other criminal record (other than possibly a misdemeanor conviction in Arkansas), his relatively young age at the time (25), and the fact that he was clearly suffering from severe and permanent brain damage exacerbated by the use of alcohol (and possibly cocaine as well) at the time of the offense." Defendant further asserts that imposing death "is also disproportionate to the nature of the offense in that only a single victim was involved and in that the initial assault was not preplanned and appears to have been the unpredictable result of the Acute Pathological

Alcohol Intoxication Syndrome from which [defendant] unknowingly suffered."

We are not persuaded. Defendant's minimal criminal record does not render the death penalty for his commission of this crime disproportionate. Nor is 25 years old particularly youthful. Defendant's proffered evidence of brain damage and affliction with APAI was contested by the prosecution's expert; in reaching their verdict, the jury obviously rejected the defense that defendant was not responsible for his actions. Finally, defendant's assertions that "only a single victim was involved" and "that the initial assault was not preplanned" fail to appreciate the savagery that this victim experienced.

Defendant, without provocation or warning, attacked a young woman who he knew was also a wife and mother. Prior to killing her, he crushed her throat, raped and sodomized her, bit off her nipples, and beat her, fracturing her nose and blackening her eye when she started to regain consciousness. He then left her suffering, gasping for air and choking on her blood for at least 45 minutes, when he returned to kill her to prevent her from "ratting" on him. While she was still alive, he strangled her, slit her throat twice, and inflicted numerous stab wounds to her chest. These stab wounds, in combination with the strangulation, killed her. "Given the extraordinarily heinous nature of defendant's crimes, the death sentence is certainly not so disproportionate that it shocks the conscience [or] offends fundamental notions of human dignity." (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

### 3. *Claim Regarding Defendant's Right to Testify*

 Defendant contends that the trial court's refusal to advise defendant of his right to testify at the penalty phase is reversible error. We disagree.

During a hearing outside the presence of the jury, but with defendant present, the following colloquy occurred: The prosecutor said, "I would like on the record that [defendant] waives his right to take the stand." Defense counsel subsequently responded, "I don't think it's appropriate to ask my client anything unless he takes the stand." The trial court agreed.

The prosecutor said, "I believe—and my position for the record is that . . . it should be made clear that [defendant] is aware of his right to testify. This is not taking anything away from him. This is not taking a constitutional right. This is he has a right and he himself is choosing not to testify. I believe it is important to be on the record in this particular type of a case." The court responded, "Mr. Bradford strikes me as being an intelligent man.

He's listened to the trial. He's heard you now, and he's spoken with Mr. Cohen and . . . Miss Lee throughout this trial. I know that Mr. Cohen is a competent attorney. In a case like this he would have had discussions with the defendant with regard to whether he should testify or not, and I will accept that as being where we are in this case."

We have already rejected defendant's claim that the trial court was required to sua sponte advise him of his right to testify at the guilt phase. (See *ante*, pp. 1052-1053.) We similarly reject the claim that he was entitled to such an advisement at the penalty phase. Indeed, even assuming the trial court had such a sua sponte obligation, there is no possibility after listening to this exchange that defendant could be unaware of his right to testify at the penalty phase.

### 4. *Effect of Any Guilt Phase Evidentiary Errors*

Defendant contends that any guilt phase evidentiary errors that may not require reversal of the guilt phase require reversal of the penalty phase. Not so. The only guilt phase evidentiary error was the admission of the booking interrogation. There is no " 'reasonable possibility' " that the jury would have rendered a different verdict absent this error; hence the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### 5. *Alleged Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct during the penalty phase argument. Not so.

#### a. *Biblical References*

Defendant first contends that the prosecutor committed misconduct by making biblical references during closing argument. We reject defendant's claim at the outset because he "failed to satisfy the general rule requiring assignment of misconduct and request for admonition as to any of the comments by the prosecutor of which he now complains," and no exception is applicable. (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1072.) We also reject the claim on the merits.

During defense counsel's opening argument, he said, "Mr. Bradford will die in prison. That is no longer an issue. . . . The only remaining question is who will decide when he dies, you or the Almighty." He later said, "When I contemplated the awesome responsibility that you will soon face, I thought

about the punishment that God gave to Cain for the murder of his brother Abel. In chapter 4 of Genesis, the Lord said to Cain, 'Your brother's blood cries out to me. You shall be banished from the land on which you spilled your brother's blood. You shall become a restless wanderer in the wilderness.' And Cain said, 'my punishment is too great to bear since you have banished me from the land and I must become a restless wanderer in the wilderness.' And the Lord put a mark on Cain and banished him out into the wilderness. Today there is hardly a place we call a wilderness. Instead we have to build our wildernesses. We call them maximum security prisons. The mark we put on people who have committed such crimes is a sentence of life in prison without the possibility of parole. Our banishment."

During the prosecution's closing argument, she said, "I believe that the defense attorney had some—had said something to the effect that should we decide if you're going to kill Mark Bradford or if God is going to kill Mark Bradford in his time. I want to tell you that's kind of a psychological ploy, a psychological defense sometimes defense attorneys use in trying to make you feel or give you the impression that you are killing the defendant if you vote for the death penalty. But you're not killing him. He killed himself on April the 18th of 1988 when he chose to rape and sodomize and slit Lynea Kokes['s] throat and stab her and everything else that he did to her. He killed himself. You are not killing him if you come back with a penalty of death. You are following the law. Because the law is the thing that lets you decide whether life or death is appropriate so do not fall for that psychological ploy that you're killing him, because you are not."

Counsel then began the comments to which defendant now objects: "I want to say a couple of things about the Bible. I have some notes here. I am not a biblical scholar. I want you to know that. But I did make a few notes on some things I read just in case any of you feel you're going against any religious tenets. . . . Defense brought up Cain and Abel, and what it said in the Bible about Cain and Abel, and I want to give you other ideas about the way the Bible feels about the death penalty. It seems that through the ages and the 10 Commandments when they talked about thou shalt not kill that is a misnomer and not true. It's the King James mistranslation of what should have been thou shalt not do murder. . . . As you know from what we've talked about murder is not killing. Killing is one thing, and when I talked to you with the jury instructions and told you what murder was, it's the unlawful killing with malice. That's murder. To go on a little bit further. The original Hebrew word defined the word murder as well, not kill. Then in the book of Deuteronomy, chapter 22, it teaches that the death penalty was required for rape and adultery back in those biblical times. In chapter 21 of Deuteronomy as well, hanging was the method for carrying out that sentence. So they had the death penalty way back then. Also the death penalty

isn't just an Old Testament or a New Testament. Both the Old Testament and New Testament are not against the death penalty. They do support it. In Acts chapter 5, it talks about [Ananias] and his wife [Sapphira] were punished with death for lying. In Exodus chapter 21, when a man kills another after maliciously seeming to do so, you must take him even from my own alt[a]r and put him to death. So I don't want this appeal to religion to dissuade any of you, because the Bible does not say thou shalt not kill. It says thou shalt not murder. And you have already decided we have had a murder here."

"We have generally condemned invocations to a different or higher law than that found in the California Penal Code." (*People* v. *Freeman, supra,* 8 Cal.4th at p. 515.) Here, however, we perceive no such invocation in the prosecutor's comments. Rather, in response to defense counsel's religious references, she simply argued that " 'imposition of the death penalty was not usurping God's authority but legitimately carrying out California law.' " (*People* v. *Davenport, supra,* 11 Cal.4th at p. 1223; see *People* v. *Arias* (1996) 13 Cal.4th 92, 180 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Indeed, the prosecutor reminded the jurors that "the law is the thing that lets you decide whether life or death is appropriate."

### b. *Future Dangerousness*

▮ Defendant contends that the prosecutor committed misconduct by implying that defendant posed a future threat to female prison guards.

During her closing argument, the prosecutor stated, "Both society outside of prison and inside of prison must be protected from somebody like Mark Bradford. There are female guards in prison." Defense counsel objected. At a bench conference, the trial court overruled the objection. Defense counsel did not seek an admonition. The prosecutor resumed her argument and did not pursue the topic.

Relying on *People* v. *Heishman* (1988) 45 Cal.3d 147 [246 Cal.Rptr. 673, 753 P.2d 629], defendant contends that there was no evidence in this case where defendant would be incarcerated or whether that institution would have any female guards. However, in *Heishman,* we upheld the prosecutor's statement that if the jury put the defendant in prison for life he would " 'play the same old games for as long as he's there. Only this time with a lot more women staff and employees around.' " (*Id.* at p. 197.) We noted that "[t]here was ample evidence of defendant's 'games,' and in this context the lack of evidence of women guards at state prisons other than [Deuel Vocational Institute] is hardly a significant matter." (*Id.* at pp. 180, 197-198.) Indeed, it is a matter of common knowledge that women are employed as state prison

guards. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1085 [80 Cal.Rptr. 567, 458 P.2d 479] [prosecutor may refer to matters of common knowledge].)

Defendant also contends that "the prosecutor's remarks were improper because they constituted an attempt to introduce before the jury a prediction of future dangerousness which the prosecutor could not have introduced through expert testimony." However, " '[W]e have held that argument directed to a defendant's future dangerousness, when based on evidence of the defendant's past conduct rather than expert opinion, is proper . . . .' " (*People* v. *Fierro* (1991) 1 Cal.4th 173, 249 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].) Here, defendant's attack on Kokes provided a basis for the prosecutor's inference that defendant would attack other women.

### 6. *Cumulative Error*

Defendant contends that even if any individual penalty phase error was insufficient to compel reversal, "the cumulative effect of all of these errors combined to irreparably prejudice his right to a fair penalty determination." There were no penalty phase errors to accumulate.

### CONCLUSION

The conviction and sentence for robbery are reversed. In all other respects, the judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I generally concur in the opinion of the court prepared by Justice Brown.

I write separately to join my colleagues in condemning the police officers who conducted the custodial interrogation of defendant in deliberate violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]—and to note, regrettably, that they did little more than act with the license given them by *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], and *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307], which allowed them to get whatever *Miranda*-violative statements they could for subsequent use in "impeachment."

I also write separately to go somewhat further than my colleagues. In my view, the prosecutor misconducted herself, albeit nonprejudicially, as she

invoked religion in support of the penalty of death: "Both the Old Testament and New Testament are not against the death penalty. They support it." Comments of this sort are improper (see, e.g., *People* v. *Sandoval* (1992) 4 Cal.4th 155, 200-201 [14 Cal.Rptr.2d 342, 841 P.2d 862] (conc. and dis. opn. of Mosk, J.)), and cannot be tolerated. Indeed, the prosecutor should have checked herself. She admitted that she was "not a biblical scholar." She then proved the fact out of her own mouth. Ironically so. The tale of Ananias and Sapphira, one of the "precedents" on which she relied for the legitimacy of the state's use of the ultimate sanction, is not such. True, Ananias and Sapphira suffered death. But they did so under a judgment imposed by an authority higher than human.

Appellant's petition for a rehearing was denied March 19, 1997.