Filed 3/21/24  P. v. Honeycutt CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DWIGHT STEWART HONEYCUTT,<br><br>    Defendant and Appellant. | C097248<br><br>(Super. Ct. No. 22F0392) |

Defendant Dwight Stewart Honeycutt was found guilty by a jury of first degree murder and possession of a firearm by a felon, among other charges, and sentenced to an indeterminate term of 75 years to life plus a determinate term of seven years and four months.  On appeal, defendant contends that the trial court erred by (1) denying his motion to suppress incriminating statements allegedly obtained in violation of *Miranda v. Ariz.* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*), and (2) using an out-of-state prior prison term as an aggravating factor without proof that defendant actually served one year or more in prison for the convictions.  Finding no error, we affirm the judgment.

1

BACKGROUND FACTS AND PROCEDURE

*Prosecution's Case*

In early 2022, defendant was living with his girlfriend, L.J., in a multifamily property unit on Pancake Hill Drive in Shasta Lake, California. L.J. lived in unit six. The victim, Roberto G., lived in unit five next door. Roberto G. and defendant occasionally socialized and used drugs together.

On the evening of March 31, 2022, Roberto G. visited defendant's unit while both defendant and L.J. were there. Defendant let Roberto G. inside and the three of them (defendant, Roberto G., and L.J.) smoked methamphetamine.

Later that evening, when Roberto G. was alone with L.J. in the bedroom, Roberto G. pulled down his pants and made sexual advances towards L.J. L.J. told Roberto G. that she was not interested, left the house, and began walking to the convenience store to buy cigarettes. Roberto G. followed her and continued to make sexual propositions. L.J. repeated that she was not interested and continued walking, as Roberto G. went the other direction.

Shortly thereafter, L.J. called defendant and told him what had happened. Defendant quickly met up with L.J. and they walked together to the store. Defendant was agitated and panicky. He exclaimed, "How dare him!" and threatened to "fire him" and "whoop his ass." He also sent a text message to Roberto G.'s girlfriend stating, "Hey, tell your boyfriend to get the fuck out. He just asked [L.J.] if she would fuck"–"if she would fuck him. I'm going to hurt him."

Defendant and L.J. went to the store, bought some items, and then walked back to defendant's house. L.J. testified that defendant was still angry and "clearly needed to calm down."

When they arrived at defendant's house, defendant went inside alone. Roberto G. was inside the house and a confrontation started as soon as defendant entered. L.J. could

2

hear defendant speaking to Roberto G. She described defendant's voice as low, but "frantic."

L.J. remained outside until defendant told her to come in. When she entered, she saw Roberto G. and defendant standing in the living room talking. Defendant accused Roberto G. of trying to "hook up" with L.J. Roberto G. denied the accusation, but defendant was not satisfied. At some point, defendant pulled out a "short shotgun" and pointed it directly at the head of Roberto G., who seemed afraid and raised his arms in the air. Defendant then fired the gun, striking Roberto G. in the head.

L.J. called 911 and told the operator that defendant shot Roberto G. with a shotgun. While L.J. was on the recorded call, defendant can be heard talking to L.J. as she responds to the operator's questions. Among other things, defendant can be heard telling L.J., "It was his gun," and that he "fought him for the gun."

When sheriff's deputies arrived, they found Roberto G. lying on his back in the kitchen with a pool of blood around his head. Roberto G. was transported to the hospital, where he died from the shotgun wound to his head. The coroner determined that the trajectory of the fatal shot was from the front of his head to the back, and slightly downward.

Deputies found a single-shot shotgun on a swamp cooler near the front door of defendant's house. An expended .410 gauge casing was still inside the gun. Deputies found additional .410 gauge shotgun ammunition inside defendant's house.

At the sheriff's station, after defendant was advised of his *Miranda* rights and confirmed he understood them, detectives interviewed defendant. During the interview, defendant told detectives that he had been smoking methamphetamine with L.J. when Roberto G. came over. Defendant gave Roberto G. "a couple of hits" and told Roberto G. to leave, but he kept going into the bedroom. Later, after L.J. left to get cigarettes, L.J. called him and told him that Roberto G. had been making sexual advances towards her. Defendant did not want L.J. to be raped or hurt, so he ran to meet up with her.

3

When defendant and L.J. returned to the house, Roberto G. was inside. Defendant did not expect Roberto G. to be there. Defendant and Roberto G. argued.

Initially, defendant claimed that the shotgun belonged to Roberto G. and that Roberto G. was shot while defendant was attempting to take the gun away from Roberto G. Eventually, defendant admitted to the detectives that it was his shotgun and that he had pointed the gun at Roberto G. Defendant claimed he only intended to scare Roberto G., but he admitted to pulling the trigger. The detective said, "[Y]ou were pissed. So you pulled the trigger." Defendant replied, "[Y]eah."

Later, after defendant invoked his right to remain silent, defendant was removed from the interview room. In the hallway outside the interview room defendant started a conversation with Detective Casey Barnhart about the Pancake Hill housing complex. The following colloquy occurred:

"[Defendant]: Smurfville. That place needs to be tore down.

"[Detective]: The what?

"[Defendant]: Smurfville.

"[Detective]: Oh yeah.

"[Defendant]: (Unintelligible) yeah, it's a fuckin' pusville.

"[Detective]: Mm-hm.

"[Defendant]: Always bad. Always bad.

"[Detective]: Always. Always something going on.

"[Defendant]: Yeah. Not my concern anymore. Goddamn (unintelligible). Everything changed in a second.

"[Detective]: Yeah.

"[Defendant]: I should'a just came clean with it–when I first came in but I . . .

"[Detective]: Why–why is that?

"[Defendant]: Because, uh, I know the–the forensics–I know–I knew I wasn't gonna get away with it.

4

"[Detective]:  Yeah the technology now today and . . .

"[Defendant]:  Yeah.

"[Detective]:  . . . everything.  Yeah.

"[Defendant]:  Yeah technology's came a long ways.

"[Detective]:  Yes it has.

"[Defendant]:  Yeah.  You guys do good work anyways.

"[Detective]:  Well, thank you.  We try.

"[Defendant]:  You knew I was lying soon as I started spittin' the lies out.

"[Detective]:  I did.

"[Defendant]:  But I can't really remember if I really just squeezed the trigger or it just went off.  It just went, boom.

"[Detective]:  Yeah.

"[Defendant]:  Problem over.

"[Detective]:  Yeah.

"[Defendant]:  I was tired, stressing about everything.  Literally I worried about [L.J.] on a daily basis.  And I–it was a challenge every day on trying to figure out how to help her with her condition.

"[Detective]:  Yeah.  Well she has to want to help herself too.

"[Defendant]:  She does, she does.  I loved her so much, that girl.  I don't know I–I hope I get to see her again, but I don't know.

"[Detective]:  Yeah.

"[Defendant]:  If I live long enough.  It's just–I'm trying to remember.  I can't remember if I just–I was pissed.

"[Detective]:  I believe ya.

"[Defendant]:  I was.  Got tired of being pushed.  My sister was a big factor in that.

"[Detective]:  Just had enough of it with her?

5

"[Defendant]: Oh yeah. Fuckin' screaming all the time. Well I did warn people that I'm about to come unglued.

"[Detective]: Yeah.

"[Defendant]: Yeah, well.

"[Detective]: Yeah.

"[Defendant]: I'm just–I'm not gonna do a long hearing or anything. I'm just–I'm gonna plead guilty but I'm also gonna plead insanity at–I was not in my right mind."

*Defense Case*

S.S. was defendant's neighbor. S.S. testified that on the night of the incident, around 11:00 p.m., Roberto G. ran up to him while he was in his car. Roberto G. seemed angry initially, but started crying when he got in the car. Roberto G. told S.S. "what had just occurred" and then left. Less than 10 minutes later, Roberto G. returned, got in the car, and said, "I'm going to beat [defendant] up," and "I think I'm going to kill him." Roberto G. then got out of the car and headed toward defendant's house. S.S. heard a gunshot about 15 minutes later.

R.P. was visiting defendant's sister in unit two on the night of the incident. R.P. testified that around 10:30 p.m., as he was preparing to leave, Roberto G. came around the corner and positioned himself in front of R.P. as though he was getting ready to fight. R.P. told him he was tired and was going to bed and did not have any "beef" with him. Without touching R.P., Roberto G. continued towards defendant's unit.

*Verdict and Sentencing*

An information was filed charging defendant with first degree murder (Pen. Code, § 187, count 1);[1] possession of a firearm by a felon (§ 29800, count 2); felony possession of a short-barreled rifle or shotgun (§ 33215, count 3); and possession of ammunition by a felon (§ 30305, count 4). As to count 1, defendant was charged with personal and

---

[1]     Undesignated section references are to the Penal Code.

6

intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).  It further was alleged as to count 1 that the crime involved great violence (Cal. Rules of Court, rule 4.421(a)(1)),[2] that defendant engaged in violent conduct that indicates a serious danger to society (Rule 4.421(b)(1)), and that defendant was armed with or used a weapon at the time of the crime (Rule 4.421(a)(2).  As to each count, it was alleged that defendant suffered three prior "strike" convictions within the meaning of section 1170.12 and served a prior prison term within the meaning of rule 4.421(b)(3).

After a jury trial, the jury found defendant guilty on all counts.  The jury found the firearm enhancement allegation for count 1 true.  In a bifurcated proceeding, the trial court found the special allegations true.

The trial court sentenced defendant to an aggregate term of 82 years and four months to life, calculated as follows:  25 years to life for count 1, doubled to 50 years pursuant to section 1170.12, plus a consecutive term of 25 years to life for the firearm enhancement; a consecutive upper term of three years for count 2, doubled to six years pursuant to section 1170.12; a consecutive term of eight months (one-third the midterm) for count 4, doubled to sixteen months pursuant to section 1170.12.  For count 3, the court imposed and stayed under section 654 a term of four years (the middle term of two years, doubled pursuant to section 1170.12).  The court dismissed two of the three prior strike allegations, but exercised its discretion not to strike the firearm enhancement allegation.

---

[2]     Undesignated rule references are to the California Rules of Court.

DISCUSSION

I

*Denial of Motion to Suppress under* Miranda

Defendant argues the trial court erred by denying his motion to suppress statements allegedly obtained in violation of his rights under *Miranda, supra*, 384 U.S. 436 [16 L.Ed.2d 694].)  We conclude the statements were properly admitted.

A.    *Additional Background*

Near the end of defendant's interview, while detectives were questioning defendant about the victim's body position at the time of the shooting, defendant told the detectives that he was "gonna plead the 5th."  The detectives asked defendant what he meant by that.  Defendant answered, "[W]ell you guys are probably going to arrest me (pause) I know this."  The detectives asked again what defendant meant by saying he was going to "plead the fifth," and defendant told the detectives that he had told them everything he remembered about the victim's body position.  The detectives continued questioning defendant for a few minutes until defendant interjected, "I don't wanna answer no more questions."  At that point, the substantive questioning ceased.

After the interrogation, defendant was processed by crime scene investigators.  During this process, defendant was asked certain questions that arguably related to the investigation of the shooting.  At one point, while discussing how L.J. got money to buy drugs, defendant interjected, "Um (pause) I really didn't mean to shoot him (pause) It just happened (pause) I (pause) that's one second of rage."

After processing was completed, defendant and Detective Barnhart had their conversation in the hallway (discussed in our summary of the facts, *ante*) in which defendant said he should have "c[o]me clean" sooner because he "knew [he] wasn't gonna get away with it."

Before trial, defendant moved to suppress every statement he made to law enforcement after he said he was going to "plead the 5th," including the statements he

8

made while being processed and the statements he made in the hallway outside the interrogation room. The People agreed not to seek admission of any statements from the interrogation after defendant's invocation of the Fifth Amendment, but otherwise opposed the motion. The People argued that the statements made by defendant after his interrogation concluded were voluntary and not the product of custodial interrogation.

Noting that the prosecution was not seeking admission of the post-invocation interrogation statements, the trial court nevertheless granted defendant's motion to suppress those statements. The court also granted defendant's motion to suppress his inculpatory statement that he "really didn't mean to shoot him . . . It just happened . . . that's one second of rage." The court denied, however, the motion to suppress the statements defendant made to Detective Barnhart in the hallway outside the interrogation room. The court found that those statements were voluntary and not the result of any interrogation.

B.    *Legal Principles*

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) In *Miranda*, the United States Supreme Court established a number of prophylactic rights designed to protect the privilege against self-incrimination during custodial interrogations. (*Miranda, supra*, 384 U.S. at pp. 467-473 [16 L.Ed.2d at pp. 719-723].) Under *Miranda*, before a suspect may be subjected to custodial interrogation, the suspect must be advised of the right to remain silent and the right to have an attorney present. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86.)

A suspect who has been given a proper *Miranda* warning may elect to waive those rights and speak with the police. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.) An express waiver is not required. (*North Carolina v. Butler* (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286, 292].) The question is not one of form, but whether the waiver was voluntarily, knowingly, and

intelligently made. (*Ibid*.; *Miranda, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 707].) Where the prosecution shows that a *Miranda* warning was given and understood, an accused's expressed willingness to answer questions has itself been held sufficient to constitute an implied waiver of such rights. (*People v. Molano* (2019) 7 Cal.5th 620, 661; *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 [176 L.Ed.2d 1098, 1113].)

Law enforcement officers are free to question a suspect who has waived his or her *Miranda* rights. (*People v. Villasenor* (2015) 242 Cal.App.4th 42, 60.) But if the suspect thereafter invokes the right to remain silent or requests counsel, further interrogation is prohibited until a lawyer has been made available or the suspect reinitiates conversation. (*Ibid*.) This ban on further interrogation "is intended to prevent police ' " 'from badgering a defendant into waiving his previously asserted *Miranda* rights.' " ' [Citation.]" (*People v. Johnson* (2022) 12 Cal.5th 544, 578 (*Johnson*).)

"Interrogation" for purposes of *Miranda* refers both to express questioning and its functional equivalent that the police should know is likely to elicit an incriminating response from the suspect. (*Johnson, supra*, 12 Cal.5th at p. 578.) However, not all questioning of a person in custody constitutes "interrogation." (*Ibid*.) The *Miranda* requirements are generally not implicated by routine booking questions, casual conversations, or neutral inquiries made for the purpose of clarifying statements that the officer did not understand. (*People v. Andreasen, supra*, 214 Cal.App.4th at pp. 86-87; *People v. Franzen* (2012) 210 Cal.App.4th 1193, 1201 (*Franzen*).)

Further, because the *Miranda* rule applies only to custodial interrogations, the rule excludes from its scope volunteered statements of any kind. (*Franzen, supra*, 210 Cal.App.4th at p. 1202; *R.I. v. Innis* (1980) 446 U.S. 291, 299-300 [64 L.Ed.2d 297, 307].) If a defendant, after invoking his *Miranda* rights, initiates a statement to the police, " 'nothing in the Fifth and Fourteenth Amendments . . . prohibit[s] the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.' " (*People v. Bradford, supra*, 14 Cal.4th at p. 1034, quoting *Edwards v.*

10

*Ariz.* (1981) 451 U.S. 477, 485 [68 L.Ed.2d 378, 387].) "Moreover, if the defendant's statement is not only voluntary, but constitutes a knowing and intelligent waiver of his [*Miranda* rights], the interrogation may resume. [Citation.]" (*Ibid.*)

In reviewing *Miranda* claims, we defer to the trial court's factual findings to the extent they are supported by substantial evidence, and independently determine whether the challenged statements were illegally obtained. (*Johnson, supra*, 12 Cal.5th at p. 578.)

C.     *Analysis*

The issue before us concerns the admissibility of incriminating statements defendant made to Detective Barnhart in the hallway outside the interrogation room, after defendant invoked his Fifth Amendment right to remain silent. Although it is undisputed that defendant initiated the incriminating exchange by spontaneously declaring he should have "c[o]me clean" sooner, defendant contends the detective then improperly resumed interrogation by asking defendant "why" he said that. Defendant contends, therefore, that any ensuing statements he made to the detective were obtained in violation of *Miranda* and should have been suppressed.

The trial court disagreed, finding that defendant's statements to the detective were voluntary and not the product of an interrogation. The court reasoned that defendant initiated and controlled the conversation, with the detective primarily giving only one-word responses. Although the detective asked defendant "why" he said he should have confessed sooner, the trial court found this to be a neutral response, intended to clarify defendant's unsolicited confession, which did not convert the subsequent exchange into an unlawful interrogation. We agree with the trial court's reasoning.

We draw support for this conclusion from *People v. Gamache* (2010) 48 Cal.4th 347 (*Gamache*). In *Gamache*, while the defendant was being booked, a deputy sheriff inquired about defendant's military service. (*Id.* at pp. 384, 388.) In response, the defendant volunteered his regret about failing to kill one of the victims. (*Ibid.*) The deputy responded by asking what happened, and the defendant made additional

11

incriminatory statements. (*Ibid.*) On these facts, the Supreme Court concluded that the defendant's statements to the deputy were not the product of an interrogation because there was "no reason" for the deputy to suspect that inquiring about defendant's military service would lead the defendant to make incriminating statements, and the deputy's "subsequent ' "neutral inqu[ires]" ' did not convert [the defendant's] volunteered admissions into the product of interrogation." (*Id.* at p. 388, citing *People v. Ray* (1996) 13 Cal.4th 313, 337-338 [officer's neutral questions about dates and locations of crimes did not convert voluntary confession into coercive interrogation]; see *Franzen, supra*, 210 Cal.App.4th at pp. 1199-1203 [officer's response of "what guy?" to defendant's unsolicited statement about a "guy looking for his money" was not interrogation].)

The same is true here. In the context of a casual conversation about the Pancake Hill housing complex initiated by defendant, defendant made a wholly unsolicited statement that he should have confessed sooner. Detective Barnhart's neutral inquiry, "[W]hy is that?" did not convert defendant's subsequent voluntary admissions into the product of interrogation.

Moreover, even if we were to assume the detective's question resumed an interrogation, we still would not find a *Miranda* violation because the record supports the conclusion that defendant knowingly, intelligently, and voluntarily waived his previously asserted right to remain silent. After having been advised of his *Miranda* rights and invoking the right to remain silent, defendant spontaneously volunteered that he should have confessed sooner.[3] At the time, defendant was standing in the hallway outside the

---

**3** There is nothing in the record to support a conclusion that defendant's unsolicited statement was the tainted product of earlier *Miranda* violations. The record shows that Detective Barnhart already had obtained a confession from defendant before defendant invoked his Fifth Amendment right. Because defendant himself had "let the cat out of the bag," the *Miranda* violations did not render defendant's subsequent confession involuntary. (*Johnson, supra*, 12 Cal.5th at pp. 584-585; *People v. Jablonski* (2006) 37 Cal.4th 774, 814-816; see *People v. Storm* (2002) 28 Cal.4th 1007, 1013, 1028.)

interview room, having a casual conversation, and was not under compulsion to speak. In addition, the transcript of defendant's conversation with Detective Barnhart shows defendant's willingness and desire to talk about the incident. Under the totality of the circumstances, defendant's conduct evidenced his intent to waive his previously asserted right to remain silent, so as to permit further interrogation. (*Johnson, supra*, 12 Cal.5th at pp. 583-584, 591-594; *Gamache, supra*, 48 Cal.4th at pp. 385-387; *Or. v. Bradshaw* (1983) 462 U.S. 1039, 1045-1046 [77 L.Ed.2d 405, 412-413].) Accordingly, for both of these reasons, the trial court did not err in denying the motion to suppress the statements.

## II

### *Sufficiency of Evidence to Support Aggravated Term*

We next consider whether the trial court erred by relying on defendant's prior prison term as a factor in aggravation.

The information alleged as a factor in aggravation (Rule 4.421(b)(3)) that defendant served a prior prison term for three counts of indecent liberties within the meaning of section 9A.44.100(1)(b) of the Revised Code of Washington. In a bifurcated proceeding, the court found this special allegation true based on certified records of the conviction. The court then relied upon this prior prison term as an aggravating factor in imposing an upper term for count 2.

Defendant argues that the trial court erred by relying on an out-of-state prior prison term as a factor in aggravation. He argues that relying on such a term should require the same proof required to *enhance* a sentence under section 667.5, subdivision (f). Because that section imposes a one-year imprisonment requirement, defendant contends the prosecution could not rely on his out-of-state prior prison term as an aggravating factor unless it proved that defendant *actually served* one year or more in prison for that conviction. Since the court did not make a finding regarding how long he was imprisoned, and the evidence necessary to make such a finding is lacking, defendant

13

contends this matter should be remanded for resentencing without consideration of the prior prison term.

Disregarding any issues of forfeiture (*People v. Scott* (1994) 9 Cal.4th 331, 351-355), the question we are asked to decide is whether the one-year imprisonment requirement of section 667.5, subdivision (f), applies when an out-of-state prior is used as a factor in aggravation under rule 4.421(b)(3). We conclude the answer to that question is "no."

We reach this conclusion based on the differences between the language of the statute governing prior prison term enhancements and the language of the rule governing factors in aggravation. Specifically, for purposes of a prior prison term enhancement, section 667.5, subdivision (f) provides that a prior felony conviction shall include an out-of-state prior felony conviction only "if the defendant served one year or more in prison for the offense in the other jurisdiction." (§ 667.5, subd. (f).) In addition, after the amendments made by Senate Bill No. 136 (2018–2019 Reg. Sess.), section 667.5 allows an enhancement for a prior prison term only if the prior conviction is for a qualifying violent felony or sexually violent offense. (§ 667.5, subds. (a) & (b); Stats. 2019, ch. 590, § 1.)

No such requirements apply when a court uses a prior prison term as an aggravating factor. Rather, rule 4.421(b)(3) merely provides that a circumstance in aggravation exists as long as "[t]he defendant has served a prior term in prison or county jail under section 1170(h)." (Rule 4.421(b)(3).) Thus, by its plain terms, rule 4.421(b)(3) is broader than section 667.5. Unlike section 667.5, subdivision (f), which includes a one-year imprisonment requirement, rule 4.421(b)(3) requires only a showing that the defendant served a prior "term" in prison. (Rule 4.421(b)(3).) The duration of that term is irrelevant and there is no requirement that the defendant actually served one year or more in prison. (Cf. § 667.5, subds. (g) & (h); *People v. Pinette* (1985) 163 Cal.App.3d 1122, 1124; *People v. Gamble* (1996) 48 Cal.App.4th 576, 578.)

14

Defendant argues that the use of an out-of-state prior as a factor in aggravation should require the same proof as using an out-of-state prior to enhance a sentence under section 667.5, but we do not agree. As we explained in *People v. Pantaleon* (2023) 89 Cal.App.5th 932, 939-941, an aggravating factor is not an "enhancement," and factors in aggravation need not " 'be pled and proven consistent with the requirements of a traditional enhancement.' " (*Id.* at p. 940.) We therefore conclude that the trial court properly relied on defendant's out-of-state prior prison term as an aggravating factor for count 2.

## DISPOSITION

The judgment is affirmed.

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Robie, Acting P. J.

_____\s\_____,
Duarte, J.

15